UNITED STATES DISTRICT COURT RECEIPT # 64740
DISTRICT OF MASSACHUSETTS AMOUNT $ 2. 7, 17
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY CLK.
DATE 6 -6 -

NORTH READING SCHOOL COMMITTEE,
Plaintiff

VS.

05 - 11162 RCL

BUREAU OF SPECIAL EDUCATION APPEALS
OF THE MASSACHUSETTS DEPARTMENT OF
EDUCATION, MASSACHUSETTS DEPARTMENT OF
EDUCATION, AND TIMOTHY GRAFTON AND COURTNEY
GRAFTON, AS PARENT AND NEXT FRIEND OF MAXWELL
GRAFTON,

Defendants

## COMPLAINT FOR JUDICIAL REVIEW OF
## FINAL DECISION OF STATE ADMINISTRATIVE AGENCY

### Jurisdiction

1. This is a complaint for judicial review of a final decision of the Defendant
Bureau of Special Education Appeals of the Massachusetts Department of Education,
pursuant to 20 U.S.C. §1415(i)(2) of the Individuals with Disabilities Education Act
(IDEA).

### Parties

2. Plaintiff is the North Reading School Committee, a body politic and corporate
as established under the laws of the Commonwealth of Massachusetts, with a usual place
of business located at Sherman Road, North Reading, Massachusetts.

3. Defendant Bureau of Special Education Appeals of the Massachusetts
Department of Education has a usual place of business at 350 Main Street, Malden,
Massachusetts.

4. Defendant Massachusetts Department of Education has a usual place of
business at 350 Main Street, Malden, Massachusetts.

5. Defendants Timothy Grafton and Courtney Grafton, in their capacity as Parents and Next Friends of Maxwell Grafton, reside at 21 Kings Row, North Reading, Massachusetts.

#### Cause of Action

6. In September, 2002, Maxwell Grafton (Student) was enrolled by the Defendant, Courtney Grafton, in a regular education first grade program operated by the Meritor Academy, a non-special needs private regular education facility.

7. In March of 2003, the Student was administered a standardized academic testing battery while enrolled at Meritor, which battery indicated that the Student was performing at or above grade level in all academic areas.

8. In September, 2003, the Student was enrolled by the Defendant, Courtney Grafton, in a regular education second grade program operated by the Meritor Academy.

9. On or about October 4, 2003, while the Student was attending Meritor, the Defendant, Courtney Grafton, submitted an application to the Landmark School (Landmark), a private special education school, seeking to enroll Student at Landmark.

10. On or about December 11, 2003, Landmark administered various testing batteries to the Student as a component of its admissions process, the majority of which testing indicated that the Student continued to function academically at grade level.

11. On or about December 11, 2003, Landmark notified the Defendant, Courtney Grafton, that it would accept the Student for enrollment in its program.

12. On or about December 17, 2003, the Defendant, Courtney Grafton, forwarded correspondence to a representative of the Special Education Department of the Plaintiff, North Reading School Committee, enclosing an evaluation report regarding Maxwell Grafton (Student) and requesting the convening of a TEAM meeting to develop an Individualized Education Program (IEP) for the Student.

13. On or about December 24, 2003, the Defendant Courtney Grafton, consented to the administration of various testing batteries of the Student by the Special Education Department of the Plaintiff North Reading School Committee.

14. On or about December 26, 2003, prior to the occurrence of either the requested testing or the TEAM meeting, and without notice to the Plaintiff, the Defendant, Courtney Grafton, enrolled the Student within Landmark.

15. On or about March 9, 2004, the Plaintiff, North Reading School Committee, through its employees, conducted a TEAM meeting in which the TEAM reviewed the various evaluation reports, and developed an IEP incorporating the evaluation recommendations and providing for Student's placement within the Primary Language-Based program within the North Reading Public Schools.

16. On or about May 10, 2004, sixty (60) days subsequent to the TEAM meeting, the Defendant, Courtney Grafton, rejected the IEP.

17. On or about August 20, 2004, the Defendant, Courtney Grafton, through counsel, forwarded written notification to the Plaintiff of the Defendants' intention to enroll the Student within Landmark for the 2004-2005 school year. Although the correspondence referenced additional evaluation reports in the possession of the Defendant, Courtney Grafton, no such evaluation reports were then forwarded to the Plaintiff.

18. In September, 2004, the Student did in fact commence his enrollment within Landmark for the 2004-2005 school year.

19. On or about September 16, 2004, the Defendant, Courtney Grafton, forwarded the additional evaluation reports to the Plaintiff, North Reading School Committee.

20. Between September 16, 2004 through December 2, 2004, the Defendant, Courtney Grafton, requested several postponements of the TEAM meeting dates established by representatives of the Special Education Department of the Plaintiff, North Reading School Committee, to review the evaluation reports submitted on or about September 16, 2004.

21. On or about December 2, 2004, the Plaintiff, North Reading School Committee, through its employees, conducted a TEAM meeting at which the TEAM reviewed the various evaluation reports, and developed an IEP incorporating the appropriate evaluation recommendations and providing again for Student's placement within the Primary Language-Based program within the North Reading Public Schools.

22. On or about January, 2005, the Defendant, Courtney Grafton, rejected the IEP.

23. On or about February 15, 17, 18, and March 14, 2005, the Defendant, Bureau of Special Education Appeals of the Massachusetts Department of Education conducted an administrative due process hearing relative to the Defendant, Timothy Grafton and Courtney Grafton's request for public funding of the unilateral placement of the Student within Landmark.

24. On or about May 6, 2005, the Defendant Bureau of Special Education Appeals of the Massachusetts Department of Education issued a Decision, a copy of which is attached hereto as Exhibit A. Said Decision was received by the Plaintiff on May 11, 2005.

25. In that Decision, the Hearing Officer concluded that:

> Student's IEP is very comprehensive, and incorporates many or most of the suggestions of both the School's and the Parent's evaluators. The lead teacher and speech therapist for the Primary Language-Based Classroom were very impressive both in terms of their backgrounds and obvious expertise and in the thought, creativity, and care they have invested in both the program as a whole and Student's IEP in particular. The regular education teacher was similarly impressive.

Exhibit A, at 19.

26. Moreover, the Hearing Officer also noted that "Student has universally been described as a likeable, funny, enthusiastic, sociable child who is eager to learn and please adults and also relates very well with peers." Exhibit A, at 3.

27. Inexplicably, despite the existence of considerable documentary evidence and testimony establishing a lack of appropriate certification status for the vast majority of Landmark staff associated with the Student, the Hearing Officer erroneously determined that "(m)ost of Student's teachers are certified special education teachers, although they may be certified for a different age group than Student's." Exhibit A, at 12.

28. Significantly, the Hearing Officer concluded that the proposed public school program was inappropriate due to Student's auditory processing and attentional issues, asserting that the Plaintiff had presented no evidence relative to how the environment would be modified to meet Student's needs. To the contrary, however, the Hearing

Officer had previously found in her Decision that Plaintiff's staff had observed that Student "easily got back on track with teacher prompts", and in fact reviewed the evidence provided by the Plaintiff relative to appropriate and extensive classroom accommodations to meet the Student's language, organizational, and attentional issues, as well as physical/structural modifications within the public school program. Exhibit A at 8, 9, 11, 14.

29.   Nevertheless, the Defendant, Bureau of Special Education Appeals determined that the IEP developed by the Plaintiff, North Reading School Committee, was not appropriate to meet the Student's needs for the period of March 2004 through and including March, 2005, and ordered the Plaintiff to reimburse the Defendants for the costs associated with the Landmark placement for the period of September, 2004 through and including March, 2005.

30.   In light of the considerable uncontroverted evidence presented by the Plaintiff during the course of the due process hearing relative to Student's academic, social, and emotional abilities and performance, as well as the extensive instructional and environmental modifications/accommodations to meet the Student's auditory processing/attentional needs, the Decision clearly indicates a bias against public school programming.

31.   The Plaintiff, North Reading School Committee, is aggrieved by the Defendant Bureau of Special Education Appeals of the Massachusetts Department of Education's Decision of May 6, 2005, in that the Decision is incorrect as a matter of law, is not supported by the preponderance of the evidence, is arbitrary and capricious, and is unwarranted by the facts on record.

WHEREFORE, the Plaintiff, North Reading School Committee, prays that this Court reverse the Decision as issued by the Defendant Bureau of Special Education Appeals of the Massachusetts Department of Education, determine that the IEPs as developed by the Plaintiff for the periods of March, 2004 through and including March, 2005 provide a free appropriate public education for the Student, and award the Plaintiff

such other and further relief as the Court deems just and appropriate.

The Plaintiff,

NORTH READING SCHOOL
COMMITTEE,
By its attorney,

_Tll. Nuttall_

Thomas J. Nuttall, Esq.
Sullivan and Nuttall, P.C.
1020 Plain Street, Suite 270
Marshfield, MA. 02050
(781) 837-7428
BBO 546940

Dated: June 6, 2005

May 6, 2005

# COMMONWEALTH OF MASSACHUSETTS
# BUREAU OF SPECIAL EDUCATION APPEALS

---

## NORTH READING PUBLIC SCHOOLS
## BSEA #05-2109

---

### BEFORE

### SARA BERMAN, HEARING OFFICER

### TIM SINDELAR, ATTORNEY FOR THE PARENTS

### THOMAS NUTTALL, ATTORNEY FOR THE SCHOOL

## COMMONWEALTH OF MASSACHUSETTS
## SPECIAL EDUCATION APPEALS

**In Re: North Reading Public Schools**                    **BSEA #05-2109**

### DECISION

This decision is issued pursuant to 20 USC Sec. 1400 et seq. (Individuals with Disabilities Education Act), 29 USC Sec. 794 (Section 504 of the Rehabilitation Act); MGL c. 71B (the Massachusetts special education statute; "Chapter 766"); MGL c. 30A (the Massachusetts Administrative Procedures Act), and the regulations promulgated under these statutes.

On October 27, 2004, Parents filed a hearing request with the Bureau of Special Education Appeals (BSEA) alleging that the North Reading Public Schools (North Reading or School) had denied Student a free, appropriate public education (FAPE) from June 2003 to March 2004 by failing to evaluate Student and offer him an IEP; that the School's IEP for March 2004 – March 2005 was not designed to provide Student with FAPE, and that Parents' unilateral placement of Student at the Landmark School was appropriate. Parents requested an order directing North Reading to reimburse Parents for the costs of the unilateral placement from January 2004 forward, as well as compensatory services and cost of litigation including attorney fees.

On November 15, 2004 the School filed an assented-to request to postpone the automatic hearing date of November 17, 2004. The request was granted, and at Parents' request, a pre-hearing conference was held on December 9, 2004. Pursuant to the pre-hearing conference, the Hearing Officer issued a Notice of Hearing for February 15, 17, and 18, 2004. Additionally, the parties were ordered to file on December 21 and 24, respectively, memoranda and stipulations of fact relative to Motions for Partial Summary Judgment on the issue of reimbursement for 2003-04.

By letter dated December 22, 2004, Parents' counsel stated that "[t]he parents have elected not to pursue reimbursement for the 2003-2004 school year (except as a possible remedy for any potential child find violation)." This waiver of the reimbursement claim, which eliminated the need for partial summary judgment motions, was affirmed by an Order dated December 23, 2004.

A hearing on the merits was held as previously scheduled on February 15, 17, and 18 and March 14, 2005, at the office of the BSEA in Malden, MA. Each party was represented by counsel, presented documentary evidence and examined and cross-examined witnesses. .

Those present for all or part of the proceeding were:

Student's Mother
Student's Father
Dr. Susan M. Brefach          Private Neuropsychologist
Ruth Margulies               Private Speech/Language Therapist
Karl Pulkkinen               Public School Liaison, Landmark School
Starry Cook                  Case Manager, Landmark School
Christine D'Anjou            Director, Pupil Personnel Svcs., N. Reading Public Schools
Jim Canino                   Asst. Dir. Pupil Personnel Svcs., N. Reading P.S.
Christine Myette             Third Grade Teacher, E.E. Little School, N. Reading
Pearl Feeney-Grater          Speech/Language Pathologist, N. Reading Public Schools
Carrie Fiore                 Primary Language-Based teacher, E.E. Little School
Tim Sindelar, Esq.           Attorney for Parents
Thomas J. Nuttall, Esq.      Attorney for North Reading Public Schools
Jonathan P. Lodi             Court Reporter

The official record of the hearing consists of Parent's Exhibits P-1 through P-28; School's Exhibits S-1 through S-26, and approximately 16.5 hours of tape-recorded and transcribed oral testimony and argument. At the parties' request, leave was granted to file written closing arguments by April 4, 2005. This date was extended to April 11, 2005, also at the request of the parties, on which date the briefs were filed and the record was closed.

## ISSUES PRESENTED

1.    Were the IEP and placement offered by North Reading for the 2004-2005 school year reasonably calculated to provide Student with a free, appropriate public education?

2.    If not, is the Landmark School placement in which Student's parents unilaterally enrolled him, appropriate?

3.    Is Student entitled to compensatory services for the 2002-2003 and 2003-2004 school years as a result of the alleged failure of North Reading to offer special education and related services?

## POSITION OF PARENTS

The IEP and placement that North Reading offered Student in March 2004 for the spring of 2004 and the beginning of the 2004-2005 school year were not capable of providing Student with a free, appropriate public education (FAPE). The proposed language based program is not sufficiently integrated, cohesive or comprehensive to meet Student's needs. It does not provide an appropriate peer group, includes a mainstream science class that is inappropriate for Student, and cannot be modified to meet his needs. Moreover, the subsequent IEP and placement offered in December 2004 should be

2

disregarded as a basis for a decision here because the TEAM that produced the IEP did not include the necessary personnel. On the other hand, the Landmark School placement chosen by Parents meets Student's needs. Finally, North Reading failed to offer special education services to Student while he was enrolled in a private school. Therefore, North Reading is liable for compensatory services corresponding to the period from June 2002 to March 9, 2004. A fair and reasonable remedy in this case is tuition reimbursement for the period from January 1, 2004 through the end of the 2003-2004 school year.

## POSITION OF SCHOOL

The North Reading Public School program is reasonably calculated to provide Student with FAPE, in that it can provide Student with a seamless, integrated program that provides appropriate instruction while enabling to benefit from exposure to typical peers. On the other hand, the Landmark School placement is overly restrictive and inappropriate for Student. Finally, Parents are not entitled to any award of reimbursement or compensatory services associated with alleged violation of statutory child find requirements, as such violations are de minimus and are merely a pretext for asserting an otherwise unwarranted claim for compensatory services or reimbursement.

## FINDINGS OF FACT

1. Student is a nearly ten-year-old child who lives with Parents in North Reading. Student has universally been described as a likeable, funny, enthusiastic, sociable child who is eager to learn and please adults and also relates very well with peers. Student especially enjoys sports, including hockey, baseball and soccer, and plays on town teams. Student has at least high average intellectual ability, and is creative and inquisitive. Student can be self-critical and is sensitive about how his academic performance compares with that of his peers. (P-1, Mother)

2. There is no dispute as to Student's areas of need. Student has a long-standing, well documented history of significant language-based learning disabilities, deficits in memory and executive functioning, and marked distractibility. Currently, Student continues to have a pervasive and moderate language learning disability that affects the entire spectrum of language including auditory processing, discriminating language sounds and words, storing information in short term memory, transferring information into long term memory, retrieving information, and organizing and formulating language for oral expression. He has reading difficulties that are consistent with a diagnosis of developmental dyslexia. Student also has diminished attention and concentration although he has not received a firm diagnosis of ADHD. While Student is generally emotionally healthy, his self-esteem is very tied to his perception of his academic performance. He can become more easily discouraged than other children his age, even those with language issues, if he is having difficulties with a language-related or academic task, and he sometimes gives up easily. (P-1; Brefach, Mother)

3

3. Student's disabilities affect his ability to read, write, and express himself orally, and hence to perform academically at a level commensurate with his ability. He is very aware that his non-disabled peers did not struggle as much as he did academically, is particularly vulnerable to feeling less competent or intelligent than others, and does not want to feel or appear singled out as such. (Brefach, Margulies, Mother, P-1 ,

4. Between the ages of 21 months and three years (March 1997 – May 1998), Student received Early Intervention (EI) services for what was first diagnosed as language delays and subsequently designated as global developmental delays. (P-8, P-9) [1] Student had significant deficits in numerous domains including expressive and receptive language, play and communication skills, regulatory/sensory functioning, and the ability to sustain attention and maintain eye contact. EI services included a toddler playgroup, a home program, and speech/language and occupational therapy. (P-9, P-10)

5. North Reading assumed funding responsibility for Student's EI services from his third birthday in May 1998 until the start of the 1998-99 school year in September 1998. Beginning in September 1998 and for the next three academic years (1998-99, 1999-00, 2000-01) Student attended North Reading's integrated pre-kindergarten program under IEPs that provided for speech/language therapy, consultations by speech/language and occupational therapists, and 11 hours per week in the pre-kindergarten classroom. (P-20, 21, Mother) At some point during Student's time in preschool, Parents began supplementing his program with private 1:1 speech/language therapy outside of school. (Mother)

6. Student made progress in the North Reading pre-K program. His speech and pre-academic skills improved. By June 2001, Student had achieved his IEP goals. (P-20)

7. In June 2001, the North Reading TEAM developed an IEP for the 2001-02 school year (kindergarten) that noted Student's relative weakness in short term auditory and sequential memory and called for speech/language therapy 2x30 minutes per week as well as a number of classroom accommodations. (P-18) The "Parent and/or Student Concerns" section of the IEP noted Parents' concerns about the class size of a regular kindergarten being overwhelming for Student. (P-18)

8. Parents did not respond to this IEP because they previously had decided to place Student at Meritor Academy (Meritor), the private regular education school where Mother then was a substitute teacher and later began to teach kindergarten. Parents made this decision because they felt that Student needed a full day program for academic reasons, instead of the half-day kindergarten available in North Reading. Parents considered whether they would use public school speech/language services for Student as offered by North Reading, or continue with private services, and

---

[1] One evaluation by the Children's Hospital Developmental Evaluation Clinic reported Student as having a global developmental delay with "atypical features," but these features (inconsistent eye contact and diminished social interaction) had mostly resolved by the next evaluation.. (P-8)

ultimately decided on the latter.[2] (Mother) In approximately late August 2001 Parents informed North Reading that they would be sending Student to Meritor and utilizing private speech therapy services. (P-18, Mother)

9. Student attended Meritor during the 2001-02 school year (kindergarten) where he was in a class of 15 students. Student received private speech therapy services after school. At the end of the kindergarten year, at the recommendation of the speech therapist, Parents hired Student's kindergarten teacher to provide private tutoring in reading, in lieu of speech therapy, for the remainder of the school year as well as the summer of 2002. The reading tutor used elements of the Reading Recovery program as well as other, unspecified methods. Both the speech therapist and tutor consulted with Mother, who then passed their recommendations to Students teachers. (Mother)

10. Student began first grade at Meritor in September 2002, in a class with fewer than 15 children. He continued to receive private tutoring in reading, but otherwise did not receive any specialized instruction. (Mother)

11. Mother neither received nor initiated contact with the North Reading Public Schools while Student attended Meritor in 2001-02 and 2002-03. (Mother)

12. In September 2003, when Student was 8 years, 4 months old and in second grade at Meritor, Parents had him privately evaluated by a neuropsychologist, John E. Lappen, Ph.D. Parents were concerned that Student was continuing to have speech/language problems, was struggling in school, and was beginning to lose his enthusiasm for school. (Mother, P-3, S-19)

13. Dr. Lappen's testing revealed that Student had average to above average cognitive ability with stronger visual-spatial than language skills and a statistically significant difference between the two domains. Test results indicated that Student had deficits in language functioning and processing, including difficulty with word retrieval, and with labeling of his ideas. Student's executive functioning was variable and somewhat inconsistent. He had some problems with sustained attention and concentration. Student's academic skills in reading, written language and math were below what would be expected for a child of his age and cognitive ability. (P-3, S-19)

14. Dr. Lappen's assessment of Student's social emotional status was that while his self-esteem was generally intact, Student identified with the "funny kids" and not the "smart kids," was feeling less positive about school than he had in the past, was increasingly aware of how his performance stacked up against that of his peers, and was feeling less competent than his peers. (Id.)

15. Dr. Lappen concluded that Student's overall performance was consistent with ADHD (inattentive type) and a developmental reading disorder. He made several recommendations including

[2] At all relevant times, Meritor did not have speech/language or occupational therapists on staff. (Mother)

- At least four sessions per week of individualized support in reading and written language with a learning disabilities specialist that includes work on phonological analysis with a program such as Lindamood-Bell, a linguistically based approach to reading and written language like Orton-Gillingham or Wilson, and work on sight words, and practice reading aloud to enhance fluency;
- Monitoring of Student's attention and self regulation, and providing numerous accommodations including alternating desk top and high interest tasks, preferential seating, extra response time and time to do assignments; breaking down and reviewing tasks, use of checklists, limiting copying requirements, providing opportunities to practice oral language, providing for home-school communication. (Id.)

16. Parents met with Dr. Lappen shortly after the evaluation to discuss the results, but did not receive a written report until approximately November 2003. Meanwhile, Parents began investigating Landmark School as a possible placement for Student. Parents were interested in Landmark because another parent told Parents that Landmark served students with language and reading disabilities, because one of Mother's relatives had attended Landmark some years previously, and because Dr. Lappen told Mother that Student was "a poster child for Landmark." (Mother)

17. Shortly after the Lappen evaluation was completed, still in September 2003, Mother contacted Mr. Jim Canino, Assistant Director of Pupil Personnel Services for North Reading, discussed the Lappen evaluation, and also mentioned Landmark School as a possible placement for Student. Mr. Canino told Mother about North Reading's language based elementary classroom. Mother asked to observe the classroom, and Mr. Canino informed her that she could do so after North Reading had received Dr. Lappens' report. (Mother)

18. Parents received Dr. Lappen's report in November 2003 and sent it to North Reading about a month later, along with a letter requesting a TEAM meeting as follows:

...I am concerned about [Student] and his current [Meritor] placement. It seems even with the small structured class he is having difficulty progressing in accordance with his cognitive abilities due to his disability. Please contact me as soon as possible to set up a team meeting to create an IEP for him. (S-18)

North Reading received the letter and report on December 17, 2003. (S-18, S-19)

19. Meanwhile, in September or October of 2003 Parents visited Landmark and decided that it would be appropriate for Student. On December 11, 2003, Landmark screened Student for possible admission. Formal assessments were consistent with prior testing, indicating that Student's strengths lie in visual tasks, using verbal mediation to aid memory, self-correction and oral vocabulary and weaknesses in phonological

6

memory and processing and coding/decoding skills. An interviewer concluded that Student was appropriate for Landmark. (P-12)

20. Landmark accepted Student in December 2003 and Student began attending in January 2004 as a parentally-placed and funded day student. (Mother, Pulkkinnen)

21. Parents did not notify North Reading before they placed Student at Landmark. (Mother) They first informed North Reading of the placement in approximately January 2004. (Mother)

22. In February 2004, North Reading conducted its own psychological, educational, and speech/language evaluations and also observed Student at Landmark.

23. Dr. Mary Lou Dysart conducted the psychological evaluation, which consisted of a review of Dr. Lappen's report and other records as well as the Woodcock-Johnson Test of Cognitive Ability-III. The standardized testing revealed strengths in many areas, including verbal comprehension, visual-auditory learning, spatial relations, and concept formation. In these areas, his percentile ranking for age ranged from the 31st to the 75th percentile. (S-14, P- 4) Student had more difficulty with sound blending, short-term auditory memory, and auditory closure (identifying a completed word after hearing the word pronounced with phonemes). Dr. Dysart observed that Student was "alert to all potential environmental distractors, both auditory and visual," and often needed external redirection to focus and understood directions but had trouble holding them in memory. In sum, Dr. Dysart found her results to be consistent with those of Dr. Lappen. She also agreed with Dr. Lappen's recommendations, stating that they all could be provided within the public school setting, and noting that Student is "a bright boy" who would benefit from exposure to much of the general curriculum. (Id.)

24. Pearl Feeney-Grater performed the speech-language assessment, which consisted of standardized testing, review of all records, and observation at Landmark. (P-15, S-15, Feeney-Grater) She found Student to have average to above-average cognitive ability and many strengths, including a charming personality, ability to make friends, athletic ability, and strong rote memory. She also concluded that Student has a specific learning disability affecting executive functioning, self-regulation, short and long term memory and both oral and written expressive language. (Feeney-Grater)

25. Student generally performed in the average range on standardized tests measuring vocabulary, automaticity of word retrieval, ability to attach meaning to words, and the ability to understand and use language in the areas of meaning, structure, and recall. However, there was scatter among subtests. Student did better on tasks accompanied by pictures or where questions could be repeated. He also had difficulty with auditory working memory, which slowed his responses to questions. (Id.) He was able to express himself orally but showed evidence of retrieval difficulties as well as difficulty with retrieving and formulating responses. In the classroom, Student would likely have problems responding quickly to lengthy or complex verbal information,

7

and would benefit from repetition, cuing, and extra time to respond. Ms. Feeney-Grater recommended placement in a small, language-based classroom, with speech-language therapy as well as numerous accommodations to help Student with remembering, formulating, and retrieving information, comprehension, and higher order thinking. She also recommended use of two Lindamood-Bell programs: the LiPS program for phonemic processing and Visualizing and Verbalizing for comprehension. (Feeney-Grater)

26. The Learning Disabilities (LD) assessment was conducted by Carrie Fiore, who teaches the elementary language-based classroom at the E.E. Little School. Ms. Fiore administered some of the subtests from the Detroit Tests of Learning Aptitude-4 (DTLA-4). This testing showed average non-verbal skills and "poor" verbal skills [3] with a significant difference between the two domains. (P-5, S-13) Student had the most difficulty with tests of auditory memory and learning, as well as retrieving information from long-term memory. Expressively, Student was more successful with writing answers to questions than responding orally. (Id. )

27. Ms. Fiore also observed Student during his Auditory/Oral Expression class at the Landmark School. (Details of that observation will be discussed below).

28. Like the other evaluators, Ms. Fiore concluded that Student is an engaging and friendly child with generally average ability to process information and respond to classroom demands, but with difficulties in word retrieval, formulation, receptive skills and working memory that impact reading, writing, and language processing. Ms. Fiore also noted that Student seemed distractible but was easily refocused with teacher prompts. She also recommended a small, structured multi-sensory classroom with support services, such as speech and language, and agreed with Ms. Feeney-Grater on accommodations and reading methodologies. (P-5, S-13, Fiore)

29. On February 26, 2004, Ms. Feeney-Grater and Ms. Fiore observed Student for one class period in his Auditory/Oral Expression class at the Landmark School. Ms. Fiore observed that Student was quiet but participated appropriately in the class, responded well to the teacher's positive reinforcement and encouragement, and frequently needed teacher prompts or repeated directions because he was distracted by a drawing he was doing during dictation, by his pencil, a previous drawing he had done, the envelope he had drawn on "and his own thoughts;" however, he easily got back on track with teacher prompts. (P-5, S-13, Fiore)

30. On March 9, 2004, North Reading convened a TEAM meeting and shortly thereafter issued an IEP calling for placement in North Reading's substantially separate Primary Language-Based program at the E.E. Little Elementary School taught by Ms. Fiore for all academic subjects except science, which was to take place in a regular second classroom. (P-14, S-11)

---

[3] Ms. Fiore's report notes that the Student's performance on these tests was worse than on similar tests given by Dr. Lappen, where he had scored in the solidly average range in both domains. Id.

31. The IEP goals focus on reading decoding, fluency and comprehension, spelling and written expression, math, work habits and attending skills, and oral expression. Student was to receive modified curriculum in all areas. Student would be provided with a multi-sensory, phonetically based reading approach such as Wilson, LiPS, or Orton Gillingham as well as Nanci Bell Visualizing and Verbalizing. Student would be given instruction, reinforcement and self-monitoring strategies to help him develop the ability to stay focused, without teacher prompts. (P-14, S-11)

32. The IEP also called for extensive accommodations in the classroom and for the MCAS, addressing language, organizational, and attentional issues, including rephrasing instructions, visual support for oral instruction, private cueing to gain his attention, assistance with prioritizing tasks, and preferential seating away from noise sources. Student could access the school psychologist if needed for support. Specific services offered included reading instruction 5x50 minutes per week, small group special education instruction, speech and language services 3x30 minutes per week, 1x15 minutes per week of speech/language consultation, and an approximately 5-week long summer program consisting of "summer support" 3hours/day, 3 days/week and speech/language 1 hour/week. (P- 14, S-11)

33. Mother ultimately rejected this IEP in full on May 10, 2004 "pending observation of the N. Reading Language Based Class Placement." Mother stated that she was concerned that the proposed placement would not meet Student's needs because of the varied ages, grades, and skill levels that would be taught within a single classroom. (P-14, S-11, Mother)

34. Meanwhile, in April 2004, before they rejected the IEP, Parents had Student privately evaluated by another neuropsychologist, Susan Brefach, Ed.D.[4] Parents had sought this additional evaluation because they were unsure of Dr. Lappen's tentative diagnosis of ADHD, and wanted a second opinion. (Mother)

35. Dr. Brefach administered standardized tests of cognitive, academic, and emotional functioning. She had observed Student at the Landmark School in February and in addition, observed North Reading's proposed program. (P-1, S-10, Brefach)

36. The results of Dr. Brefach's testing and observations were consistent with the evaluations of Drs. Lappen and Dysart. Like the prior evaluators, Dr. Brefach found that Student has high average overall cognitive ability with language skills consistently weaker than non-verbal skills. She found that Student "has difficulty with the entire spectrum of language functioning," including processing auditory information, discriminating sounds and words, storing information in short term memory, transferring it to longer term memory, retrieving information, and

---

[4] Dr. Brefach is a licensed psychologist and school psychologist in private practice who has approximately 15 years of experience in conducting neuropsychological evaluations of children. Dr. Brefach has worked and/or consulted for hospitals, clinics, and public school districts. She testified that she has conducted over 1000 evaluations of school aged children, about 50% of whom have language based learning disabilities. (Brefach, P-26)

organizing expressive language. (P-1, S-10, Brefach). In general, Dr. Brefach found that Student's academic functioning has been compromised by a combination of language weaknesses, reduced attention, and developmental dyslexia, and that his academic performance across a variety of tasks is highly uneven. (Id.) She concluded that he has a neurologically based learning disability affecting all areas of functioning, developmental dyslexia, and moderate to significant language learning problems. (Id.)

37. Further, Dr. Brefach concluded that Student has significant problems with auditory processing, such that auditory distractions would interfere with his learning. (Brefach)

38. Emotionally, Student is bright and creative, somewhat impulsive and disinhibited. He is very motivated to succeed but gives up easily. Dr. Brefach found Student's self-esteem to be "strongly dependent on performance issues," such that he is "at risk for further deterioration in functioning if he continues to encounter significant frustration in school." (Id.)

39. According to Dr. Brefach, when Student struggled with schoolwork, he "was very likely to be self-critical, to be more discouraged than many youngsters his age, and to give up very easily. So he was more sensitive and more reactive than many children, even those…who have learning difficulty, and his psychological makeup further impacted his ability to persist and to tolerate frustration and failure." (Brefach)

40. Dr. Brefach concluded that Student has three areas of difficulty that interact and complicate programming for him: pervasive receptive and expressive language difficulties; developmental dyslexia; and "a particularly sensitive and reactive emotional profile" that makes him more easily discouraged than other children. (Brefach) Because of his combination of difficulties, Dr. Brefach believes Student requires all instruction in a small, very homogeneous language based class of eight or fewer students, with reduced auditory distractions. Dr. Brefach believes that a public school setting would not likely provide such an environment for Student, but that the Landmark School does provide an appropriate setting, for reasons discussed further, below. (Brefach)

41. On May 26, 2004, Parents also had Student privately evaluated by a certified speech/language therapist, Ruth Margulies. Ms. Margulies' findings, in general, were comparable with those of prior evaluators, including the February evaluation by Pearl Feeney-Grater. (P-2, Margulies) Like prior evaluators, Ms. Margulies concluded that Student' communication and academic performance are compromised by a combination of difficulty with language acquisition and phonological processing, weaknesses in executive functioning and self-regulation, and working memory deficits, as well as a developmental reading disorder, high levels of frustration, attentional problems, and limited endurance. (Id.) Ms. Margulies identified Student's most pressing needs as "implementation of a systematic, explicit and intensive program …[for acquiring]..more functional decoding skills" while also

10

addressing phonological weaknesses, as Student did not yet have a solid foundation at the phonological level to map speech onto print. Ms. Margulies suggested a program such as the Lindamood Reading Program for this purpose. Ms. Margulies also recommended giving Student strategies to organize and improve his oral expression. (P-2)

42. Ruth Margolies did not observe either Student's Landmark School program or the North Reading elementary language based classroom. (Margulies)

43. In June 2004, at Parents' request, Dr. Brefach observed Student in his Landmark placement, and, the next day, observed North Reading's proposed program. For reasons discussed in more detail below, Dr. Brefach concluded that the North Reading program was inappropriate for Student, and that Student was appropriately placed at Landmark. (Brefach)

44. In a letter from their counsel dated August 20, 2004, Parents, through counsel, gave North Reading written notice of their intention to unilaterally enroll Student in Landmark for the 2004-05 school year and to file a hearing request seeking reimbursement. (P-16)

45. Student resumed attending Landmark in or about September 2004. Student's schedule was similar to what it had been the previous semester. (Mother)

46. On or about December 2, 2004, North Reading convened another TEAM meeting to consider the evaluations of Drs. Brefach and Margulies, and issued a substitute IEP covering March 2004-2005. (S-1) This IEP essentially duplicates the IEP issued in March 2004, but adds 30 minutes per week of small group speech/language therapy. The regular education science teacher, Ms. Myette, did not attend this meeting. No goals were developed for the inclusion science class. (S-1, Myette)

47. Student has continued to attend the Landmark School program. (Mother, Pulkkinnen, Cook)

## Program Proposed by the Parents

48. The Landmark School (Landmark) is a private Chapter 766-approved school that specializes in serving students with at least average cognitive ability who have language based learning disabilities, including developmental dyslexia. Landmark provides an intensive program consisting of one-to-one tutorials and small group class instruction across all curriculum areas to address specific language issues. The elementary program, in which Student is enrolled, serves 44 students, twelve of whom are third graders. (Pulkkinen)

49. During the spring of 2003-04 and fall of 2004-05, like the other Landmark elementary students, Student has received small group instruction in language arts (including written expression), math, auditory/oral expression, literature, combined social

11

studies and science, an elective (which for Student is small engine repair, although art and woodworking are also offered), and physical education. Student also has a daily, 1:1 language arts tutorial. Library and music classes are provided on a biweekly basis. Student does not receive individual speech/language therapy. Rather, a speech/language therapist co-teaches his auditory/oral expression class every other week. Student-teacher ratios for academic classes were 1:5 or 1:6 during 2003-2004 and 1:6 or 1:7 during 2004-05. (Pulkkinen, P-21) Students are grouped by skill level, and groupings may cut across grade and age lines. Student is in one group for math, where his skills are stronger, and another for all other subjects. Both groups comprise third, fourth and fifth graders. (Cook)

50. The reading tutorial is a central focus of Student's program. The tutor works with Student on the LiPS program for the majority of the time, but also works on other skills such as sequencing days of the week and months of the year, spelling rules, following oral and written directions, and applying the LiPS strategies to contextual reading. (Cook) Student's tutor and all of his teachers are trained in the LiPS program, and cue Student to use LiPS strategies throughout the school day. (Cook)

51. Like each Landmark student, Student has a case manager, Ms. Starry Cook, who oversees implementation of his program at Landmark.[5] Ms. Cook is responsible for reviewing Student's file, designing his language arts tutorial program, supervising his reading tutor by observing the tutorial regularly and giving feedback to the teacher as well as signing off on progress reports for Student's tutorial. She has observed Student in class on several occasions. Ms.Cook also attends the various teacher meetings that are held regularly, and is available to Student and his parents to address any concerns. (Cook)

52. Most of Student's teachers are certified special education teachers, although they may be certified for a different age group than Student's. Other teachers have certifications pending with the Mass. Department of Education. All teachers and the tutor are supervised by a certified teacher. (Cook, Pulkkinnen, P-25.)

53. Additionally, all new teachers receive a one-week training session during the summer prior to starting employment at Landmark, where they study the methodologies used at Landmark. All of Student's teachers, as well as his tutor, have completed training in the LiPS program. (Cook)

54. Student's providers at Landmark and Parents believe that Student has adjusted well to the program, has made friends and is happy there. (Mother, Cook, Pulkkinnen) Parents believe that he has gained confidence, and does homework more willingly and independently. (Mother) Landmark's reports reflect that Student is making progress in his classes and in LiPS2 (P-22, 23, 24; Cook) On the other hand, Student

---

[5] Ms. Cook is Student's third case manager since he started at Landmark. Mr. Mangano was his case manager for Student's first semester during the spring of the 2003-04 school year. Student had a second case manager assigned at the beginning of the 2004-05 school year, who went on maternity leave in January 2005. Ms. Cook took over the position at that time. (Cook)

12

has continued to have problems with distractibility and attention, can get overwhelmed with too much oral information at once, and needs much repetition, simple language, and teacher help with staying focused. (Cook, P-24)

55. As stated above, both North Reading's representatives (Ms. Fiore and Ms. Feeney-Grater) and Parents' expert (Dr. Brefach) observed Student at Landmark in February 2004, shortly after he started there. (Fiore, Feeney-Grater, Brefach)

56. Dr. Brefach found the program as a whole to be appropriate for Student because it provides, as she recommends, small classes with peers who appear to be at Student's skill level (based on observation as she has not reviewed those students' records), as well as teachers who consistently and appropriately adapt language in all settings. Dr. Brefach also found the tutorial to be appropriate for addressing Student's various auditory training and reading issues. Finally, Dr. Brefach believed that Student does not require speech-language therapy in addition to his daily program at Landmark because his entire day is linguistically adapted and because he receives a speech therapist's input in his co-taught auditory/oral expression class. (Brefach)

57. Ms. Feeney-Grater observed Student in his language arts, math, woodworking, and literature classes, as well as in his reading tutorial. She found generally that the Landmark program has appropriate instructional techniques, in that it provides teacher-directed classes, structure, organization, and consistency of approach across classes that is important for children with language learning disabilities. She was impressed with the math class and with the tutorial, and particularly with Student's ability to read difficult words. She was concerned, however, about what she perceived as the absence of social interaction among students and between students and teachers, apparent flatness of Student's affect, absence of verbal transitions, absence of spiraling back and previewing at the beginning of literature class, and the practice of having children draw as they are read to. In general, Ms. Feeney Grater observed the teachers moving children from one activity to the next without a lot of transitional conversation, as well as numerous lost learning opportunities. (Feeney-Grater)

58. Ms Fiore essentially agreed with Ms. Feeney-Grater that there were shortcomings in how Landmark executed its program so that there were missed learning opportunities. (Fiore, P-5)

59. Both Ms. Feeney-Grater and Ms. Fiore believed that North Reading's Primary Language-Based program provided an equivalent or superior educational program for Student than Landmark School. (Feeney-Grater, Fiore)

60. The program that North Reading proposed for Student in March and December 1994 consists of the substantially-separate language-based classroom for all academics except science, which is held in Ms. Myette's regular third grade class. Student would also be mainstreamed for homeroom, art, music, and P.E. The language-based classroom serves a total of nine students (Student would be the tenth) ranging in age

from approximately Student's age to approximately two years younger. As of the hearing date, four students are diagnosed with a specific learning disability, four with a communication disorder, and one with a neurological disability. (P-28) Some children are diagnosed with attention deficit disorder. All have at least average cognitive ability, and all have difficulties with expressive and/or receptive language. (Fiore, Feeney-Grater)

61. The program is staffed by Ms. Fiore, Ms.Feeney Grater and two paraprofessionals, both of whom are certified teachers, and one of whom has special needs certification. (Fiore, P-28)

62. Ms. Fiore is dually certified in elementary education and moderate special needs (K-9). She also is certified in the Orton-Gillingham reading method, and has been trained in LiPS,[6] Nanci Bell Visualizing & Verbalizing, Project Read (phonology) and the John Collins writing method. (Fiore, S- 20). Ms. Fiore created the primary language-based class at the E.E. Little School, and functions as the lead teacher. (Fiore, S-20)

63. The program is located in a regular sized classroom that is organized into several learning centers so that more than one small group of children can work on different activities at the same time. Thus, for example, while one group of three might be working on a literature lesson with one of the paraprofessionals, another group of three would be writing with the second "para," and the third group would be doing a reading lesson with Ms. Fiore. (Fiore) Free-standing whiteboards and bookcases are used to divide the room, and tennis balls are placed on chair legs to reduce noise. (Fiore, Feeney-Crater)

64. Student's third grade program for 2004-05 would include a daily 1:1 reading tutorial with Ms. Fiore using LiPS and eventually a rules-based decoding program like Orton-Gillingham; daily circle time, listening comprehension, speech/language, writing, a weekly social pragmatics group, math, mainstream science, literature, spelling, specials (art, music, library, gym). Except for circle time, which is a whole class activity, Student would be in groups of three with one teacher or paraprofessional for instructional activities, within the language-based setting. (Fiore, P-26)

65. Various language-based strategies and methods are used to assist the students with language tasks and would also be provided to Student, including pre-teaching, spiraling and review, as well as the John Collins writing method and Nanci Bell Visualizing and Verbalizing. Students have four periods per week when they can use the computer independently, and have access to E-Reader and other educational applications. (Fiore)

66. Third grade students in the primary language-based class attend science in the regular third grade classroom taught by Ms. Christine Myette, who is dually certified in

---

[6] Ms. Fiore became qualified to provide LiPS training in October 2004, after the start of the 2004-05 school year.

14

regular and special education for grades K-8. (S-26, Myette) As many as three paraprofessionals may assist Ms. Myette (the aide assigned to her classroom, a "para" from the language based classroom, and a "para" from the learning center) (Myette) Including those from the language-based class, approximately 23 students attend the science class. The format of the class is almost entirely hands-on, with little or no reading required. Ms. Myette breaks the class into heterogeneous groups of four, and each group works cooperatively on an experiment. The students use a word list that they have previously generated and that they use to write notes on their observations. Ms. Feeney-Grater works separately with the language-based class students on understanding the word list. (Myette, Feeney-Grater, Brefach)

67. At Parents' request Dr. Brefach observed the language-based class and the science class in June 2004 and again in February 2005. In the first visit, Dr. Brefach concluded that the science class was well-controlled but too auditorily distracting (because of the class size and multiple learning groups) for Student. Additionally, she felt that the language used was not adequately adapted for Student. For these reasons, Student would find the science class frustrating and would not be able to access the curriculum. In language-based classroom, Dr. Brefach felt, generally, that the instructional language was not consistently adapted for Student's needs, that the peer group was too diverse in its skill and grade levels, and that the number of second graders (3) was too small to form an adequate peer group for Student. (P-1, S-10, Brefach) She observed the language based class again in February 2005. (Brefach, Fiore, Myette, P-1,S-10) As stated above, based on her observations, Dr. Brefach recommended that Parents re-enroll Student at Landmark for 2004-05, and Parents did so. Mother did not visit the North Reading program, choosing instead to have Dr. Brefach do the observation. (Mother)

68. Dr. Brefach's February 2004 visit to North Reading took place one day after her visit to Landmark. In the notes that she took at the Landmark visit, before ever seeing the North Reading program, Dr. Brefach made a statement to the effect that a public school would not be able to provide the linguistic consistency that Landmark could provide. (Brefach)

69. Dr. Brefach's conclusions after her February 2005 observation were similar. She found that the structure of the language-based class, where several activities were going on at the same time in the same room, was auditorily distracting. She also was concerned about the peer group, observing that the other third graders did not appear to have auditory processing problems, and that one student had significant problems with expressive language and social interaction. For these reasons, Dr. Brefach concluded that the North Reading program was still inappropriate for Student, as it still did not provide the degree of consistency in use of language and reduced auditory distraction to enable Student to succeed, in light of his unique combination of dyslexia, auditory processing and memory deficits, and emotional reactivity to academic difficulties. (Brefach)

15

70. Ms. Fiore and Ms. Feeney-Grater believe, on the other hand, that the combination of the physical and programmatic structure of the language based class, as the specific accommodations prescribed for Student and the strategies to be used in connection with his IEP goal of improving attending skills, have been, at all relevant times, sufficient to enable Student to succeed in North Reading's program. (Fiore, Feeney-Grater)

## FINDINGS AND CONCLUSIONS

Based on the evidence at hearing, I reach the following conclusions:

1.   The placement and services offered by North Reading for period from March 2004 to March 2005 were not calculated to provide Student with FAPE;
2.   Parents' unilateral placement at Landmark was appropriate; however,
3.   Parents are not entitled to reimbursement for the costs of the Landmark placement prior to the start of the 2004-2005 school year.
4.   The Parents are not entitled to compensatory service for the period from June 2002 through March 2004.

## Legal Framework

### The FAPE Standard

There is no dispute that Student is a school-aged child with a disability who is eligible for special education and related services pursuant to the IDEA, 20 USC Section 1400, et seq., and the Massachusetts special education statute, G.L. c. 71B ("Chapter 766"). Therefore, Student is entitled to a free appropriate public education (FAPE) as defined in federal and state law.

The IDEA defines FAPE as special education and related services that (A) are provided at public expense and under public control; (B) meet the standards of the state educational agency; (C) include an appropriate preschool, elementary, or secondary school education; and (D) are provided in conformity with an properly developed IEP. 20 USC Sec. 1401; 34 CFR Sec. 300.13. The corresponding state statute defines FAPE as special education and related services that conform to the IDEA and its regulations and also "meet the education standards established by statute or...by regulations promulgated by the Board of Education." G.L. c. 71B, Sec.1.

In general, FAPE encompasses substantive appropriateness, placement in the least restrictive environment (LRE) consistent with providing an appropriate program, and conformity with the IDEA's procedural requirements. Substantively, federal courts have interpreted FAPE to mean an IEP and services that provide "significant learning" and

confer "meaningful benefit" on the student via "personalized instruction with sufficient support services to permit the child to benefit educationally." Hendrick Hudson Bd. of Education v. Rowley, 458 U.S. 176, 188-9, 203 (1992); see also Burlington v. Mass. Dept. of Education, 736 F.2d 773, 788 (1st Cir. 1984). The IEP must be tailored to the unique needs of the disabled child, and must be "reasonably calculated to provide 'effective results' and 'demonstrable improvement' in the educational and personal skills identified as special needs." 34 C.F.R. 300.300(3)(ii); Lenn v. Portland School Committee, 998 F.2d 1083 (1st Cir. 1993), citing Roland M. v. Concord School Committee, 910 F.2d 983 (1st Cir. 1990), cert. denied, 499 U.S. 912 (1991) and Burlington, 736 F.2d at 788. Some federal courts have held that "effective results" and "demonstrable improvement" should be measured in light of the student's individual potential. See, e.g., Houston Independent School District v. Bobby R., 200 F.3d 341 (5th Cir. 2000). On the other hand, the IDEA does not require districts to maximize a student's potential, but rather to assure access to a public education and the opportunity for meaningful educational benefit. Lenn, 998 F.3d at 1091; G.D. v. Westmoreland School District, 930 F.2d 942 (1st Cir. 1991).

Under both federal and state law, FAPE requires schools to educate eligible students in the least restrictive environment (LRE) consistent with meeting their educational needs; that is, together with, rather than segregated from, children without disabilities. 20 U.S.C. 1412(5)(A); Roland M., supra. The law requires that students should be placed in more restrictive environments, such as private day or residential schools, only when the nature or severity of the child's disability is such that the child cannot receive FAPE in a less restrictive setting. (Id.)

Finally, FAPE also entails complying with the procedural requirements of the IDEA; [7] a school district that violates a student's procedural rights under federal or state law may be liable where "procedural inadequacies [have] compromised the pupil's right to an appropriate education … or caused a deprivation of educational benefits." Roland M., 910 F.2d at 994 (1st. Cir. 1990) (citations omitted). Thus, for example, "a procedural default which permits a disabled child's entitlement to a free and appropriate education to go unmet for two years constitutes sufficient ground for liability under the IDEA." Murphy v. Timberlane Regional Sch. Dist., 22 F.3d 1186, 1196 (1st Cir. 1994). On the other hand, parents may not recover for technical or de minimis violations that do not deprive the child of FAPE. (Id.)

If parents of an eligible disabled child can prove that the program and services offered by their school district do not provide FAP, they may be reimbursed for the costs of unilaterally placing their child in a private program, if they also can prove that the privately obtained services are appropriate. School Committee of Town of Burlington v. Dept. of Education of Mass., 471 U.S. 359, 369-70 (1985). Matthew J., supra (citations omitted); In Re Gill-Montague RSD, supra. A parentally-chosen program need not be

---

[7] The IDEA's procedural requirements, among other things, are designed to ensure that IEPs are written by duly constituted TEAMs, with meaningful parental participation, and that services are delivered in a timely manner. Roland M., 910 F.2d at 994 (citations omitted); Murphy v. Timberlane Regional Sch. Dist., 22 F.3d 1186, 1196 (1st Cir. 1994).

perfect, rather, it must be "appropriately responsive to [a student's] special needs;" so that the student can benefit educationally. Matthew J., 27 IDELR at 344.

## The appropriateness of the IEPs and Placement Offered in March and December 2004

The first issue here is whether the program and services that North Reading offered to Student in the IEPs proposed in March and December 2004 were reasonably calculated to provide FAPE. If so, the inquiry stops. If not, then the issue is whether the Parents' unilateral educational placement at the Landmark School was "appropriate," i.e., whether it was reasonably tailored to meet Student's special educational needs. Matthew J. v. Mass. Dept. of Education, 989 F. Supp. at 387, 27 IDELR 339 at 343-344 (1998), citing Florence County School District Four v. Carter, 510 US 7, 13 (1993); Doe v. West Boylston School Committee, 28 IDELR 1182 (D. Mass., 1998); In Re Gill-Montague RSD, BSEA #01-1222 (Crane, August 2001) If the Landmark placement was appropriate, I must then determine whether and for what period North Reading is responsible for reimbursing Parents for the costs of the Landmark placement.

Here, the parties agree on the nature of Student's disabilities, and their impact on his educational performance, and the record amply supports their mutual view of Student. It is clear that Student is a bright, funny, happy, and likeable boy who makes friends easily and is eager to please adults and work hard in school. The record also establishes that Student's constellation of disabilities including pervasive language-based learning disabilities, coupled with weaknesses in auditory processing, working memory, oral expression, executive functioning, self-regulation and attention, as well as a higher than usual sensitivity to perceived failure, have significantly affected his educational progress and have caused him frustration and discouragement.

The parties also agree, and the record establishes, that Student needs intensive, language-based instruction, mostly in a self-contained, specialized setting to address and accommodate his language, memory, executive functioning, and attentional weaknesses. Finally, the parties are in remarkable accord on the type of services and even the methodologies that would benefit Student. They agree, for example, that he needs 1:1 instruction in a program such as LiPS to develop his phonemic processing, accompanied or followed by a rules-based encoding/decoding program such as Orton-Gillingham or Wilson Reading. They agree generally that he needs a language-based classroom for most or all academics as well as on what that term means. They also agree that he should be with peers who have at least average cognitive ability and similar language and learning needs.

While the parties may have some differences of opinion on, for example, whether or not Student should receive direct speech/language therapy, or whether or not he is ready for the Visualizing and Verbalizing program, I find that these differences are minor in light of the parties' overall agreement on Student's educational profile and needs.

The parties' sole substantive dispute is whether, at the time they were offered, North Reading's IEPs and services were reasonably calculated to provide Student with FAPE.[8]

This is a very close case. Student's IEP is very comprehensive, and incorporates many or most of the suggestions of both the School's and the Parents' evaluators. The lead teacher and speech therapist for the Primary Language-Based Classroom were very impressive both in terms of their backgrounds and obvious expertise and in the thought, creativity and care they have invested in both the program as a whole and Student's IEP in particular. The regular education teacher was similarly impressive

When analyzed in light of Student's unique profile, however, the proposed program for 2004-2005 was not appropriate for Student at the times it was offered (March and December 2004) because it did not adequately address Student's well-documented auditory processing and attentional issues. [9] The weight of the evidence shows that Student is simply too easily distracted and has too many problems with auditory processing and auditory memory to be able to function successfully in a setting where multiple activities are going on within earshot. Even in the quiet, relatively distraction-free environment of his Landmark School classrooms, where there are no more than six students and one teacher, in a small room, and all students are doing the same thing at the same time, Student requires frequent prompts to remain focused. It is hard to imagine that at least during the 2004-2005 school year, he could have remained focused in the busier setting of the language-based classroom or the mainstream science class, regardless of accommodations and strategies offered. Moreover, while it may very well be possible to modify the environment of the North Reading program to be more suitable for Student, North Reading has presented no evidence of whether and how that might be done.

If this were a hearing regarding prospective placement rather than reimbursement for a unilateral placement, the outcome might very well have been different. I do not agree with the Parents that it would be impossible to modify Student's IEP and the North Reading program in order to make it appropriate for Student. In a retroactive reimbursement case such as this one, however, I must look back at whether the IEPs and placement proposed by the North Reading Public Schools were appropriate as written, when offered (here, in March and December 2004) and find that they were not, for the reasons stated above.

---

[8] Parents argue that the December 2004 IEP should be disregarded because the process for developing it was procedurally flawed. I decline to do so and need not reach this issue because I am finding that the placement offered was substantively inappropriate for other reasons.

[9] The Parents argue that the peer grouping in the North Reading program is inappropriate. I decline to make this finding, as I do not believe that it would be supported by the evidence on the record. I further would not have found the program inappropriate on the basis of North Reading's offer of language pragmatics that might not be needed or the fact that his teachers might have to adjust Student's math program for his relative strength in math. These factors are not sufficient to support a conclusion that the program is inappropriate. What makes the program inappropriate here is a physical /structural environment that "plays" to an identified area of weakness, namely, attention, that has the potential to undermine the rest of Student's educational functioning.

19

On the other hand, the Parents' placement at the Landmark School was appropriate. Landmark is a Chapter 766-approved private school that is designed to meet the needs of children with Student's profile. No placement is perfect, and Landmark, like any school may have its shortcomings for Student. However, the overwhelming weight of the evidence is that Landmark addresses Student's language and reading issues in much the same way that North Reading proposes to do, in an environment that does not exacerbate his attentional issues. Moreover, Student appears to have made effective progress at Landmark, as noted not only by Landmark itself and Parents but also by Ms. Feeney-Grater, who commented on the progress Student had made in reading.

### The Parents are not Entitled to Compensatory Services Corresponding to June 2002 to March 2004

The Parents seek compensatory service for the period that Student was at Meritor Academy, a private, non-special needs school. Parents argue that by not conducting TEAM meetings or offering an IEP for Student during his time at Meritor (other than an offer of speech-language services), North Reading deprived Student of a meaningful opportunity to participate in the public school program while he was a private school student. Parents are correct that school districts are required to offer such opportunity to parentally-placed private school students. Here, however, even if Parents were to prove that they were denied a meaningful opportunity to participate, any offer of compensatory services for an alleged violation of this obligation would be based on speculation, in light numerous factors, including but not limited to the fact that just before Student enrolled in Meritor, North Reading wrote an IEP for kindergarten to which Parents did not respond; that Parents rejected a subsequent offer of speech-language services, and that the private speech-language therapist had discharged Student from therapy after Kindergarten. Therefore, Parents' claim for compensatory services for this period is denied.

### CONCLUSION

For the foregoing reasons, I conclude that Parents are entitled to reimbursement for Student's placement at the Landmark School for the period from the start of the 2004-2005 school year until March 9, 2005, when North Reading's proposed IEPs expired.

### ORDER

The North Reading Public Schools shall reimburse Parents for the costs of Student's placement at the Landmark School for the period referred to above.

5/6/05

Dated: May 6, 2005

Sara Berman, Hearing Officer

20

## COMMONWEALTH OF MASSACHUSETTS
## BUREAU OF SPECIAL EDUCATION APPEALS

## EFFECT OF BUREAU DECISION AND RIGHTS OF APPEAL

### Effect of the Decision

20 U.S.C. s. 1415(i)(1)(B) requires that a decision of the Bureau of Special Education Appeals be final and subject to no further agency review. Accordingly, the Bureau cannot permit motions to reconsider or to re-open a Bureau decision once it is issued. Bureau decisions are final decisions subject only to judicial review.

Except as set forth below, the final decision of the Bureau must be implemented immediately. Pursuant to M.G.L. c. 30A, s. 14(3), appeal of the decision does not operate as a stay. Rather, a party seeking to stay the decision of the Bureau must obtain such stay from the court having jurisdiction over the party's appeal.

Under the provisions of 20 U.S.C. s. 1415(j), "unless the State or local education agency and the parents otherwise agree, the child shall remain in the then-current educational placement," during the pendency of any judicial appeal of the Bureau decision, unless the child is seeking initial admission to a public school, in which case "with the consent of the parents, the child shall be placed in the public school program". Therefore, where the Bureau has ordered the public school to place the child in a new placement, and the parents or guardian agree with that order, the public school shall immediately implement the placement ordered by the Bureau. *School Committee of Burlington, v. Massachusetts Department of Education*, 471 U.S. 359 (1985). Otherwise, a party seeking to change the child's placement during the pendency of judicial proceedings must seek a preliminary injunction ordering such a change in placement from the court having jurisdiction over the appeal. *Honig v. Doe*, 484 U.S. 305 (1988); *Doe v. Brookline*, 722 F.2d 910 (1st Cir. 1983).

### Compliance

A party contending that a Bureau of Special Education Appeals decision is not being implemented may file a motion with the Bureau of Special Education Appeals contending that the decision is not being implemented and setting out the areas of non-compliance. The Hearing Officer may convene a hearing at which the scope of the inquiry shall be limited to the facts on the issue of compliance, facts of such a nature as to excuse performance, and facts bearing on a remedy. Upon a finding of non-compliance, the Hearing Officer may fashion appropriate relief, including referral of the matter to the Legal Office of the Department of Education or other office for appropriate enforcement action. 603 CMR 28.08(6)(b).

## Rights of Appeal

Any party aggrieved by a decision of the Bureau of Special Education Appeals may file a complaint in the state superior court of competent jurisdiction or in the District Court of the United States for Massachusetts, for review of the Bureau decision. 20 U.S.C. s. 1415(i)(2).

Under Massachusetts General Laws, Chapter 30A, Section 14(1), appeal of a final Bureau decision to state superior court must be filed within thirty (30) days of receipt of the decision. The federal courts have ruled that the time period for filing a judicial appeal of a Bureau decision in federal district court is also thirty (30) days of receipt of the decision, as provided in the Massachusetts Administrative Procedures Act, M.G.L. c.30A. *Amann v. Town of Stow*, 991 F.2d 929 (1st Cir. 1993); *Gertel v. School Committee of Brookline*, 783 F. Supp. 701 (D. Mass. 1992).

Therefore, an appeal of a Bureau decision to state superior court or to federal district court must be filed within thirty (30) days of receipt of the Bureau decision by the appealing party.

## Confidentiality

In order to preserve the confidentiality of the student involved in these proceedings, when an appeal is taken to superior court or to federal district court, the parties are strongly urged to file the complaint without identifying the true name of the parents or the child, and to move that all exhibits, including the transcript of the hearing before the Bureau of Special Education Appeals, be impounded by the court. See *Webster Grove School District v. Pulitzer Publishing Company*, 898 F.2d 1371 (8th Cir. 1990). If the appealing party does not seek to impound the documents, the Bureau of Special Education Appeals, through the Attorney General's Office, may move to impound the documents.

## Record of the Hearing

The Bureau of Special Education Appeals will provide an electronic verbatim record of the hearing to any party, free of charge, upon receipt of a written request. Pursuant to federal law, upon receipt of a written request from any party, the Bureau of Special Education Appeals will arrange for and provide a certified written transcription of the entire proceedings by a certified court reporter, free of charge.

℀JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

North Reading School Committee

**(b)** County of Residence of First Listed Plaintiff    Middlesex
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS

Bureau of Special Education
Appeals of the Mass. Department of Education;
Mass. Department of Education; Timothy Grafton *

County of Residence of First Listed Defendant    Middlesex
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

\* and Courtney Grafton, PPA

**(c)** Attorney's (Firm Name, Address, and Telephone Number) Thomas J. Nuttall  Attorneys (If Known)
Sullivan & Nuttall, P.C.  1020 Plain St. Suite 270
Marshfield, Ma. 02050  781-837-7428

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                  and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☒ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
20 U.S.C. 1415
Brief description of cause:
review of state due process decision - education

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE    DOCKET NUMBER

DATE    SIGNATURE OF ATTORNEY OF RECORD
6/6/05    _TJ. Nuttall_

FOR OFFICE USE ONLY

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) __North Reading School Committee vs. Bureau of__
__Special Education Appeals of the Mass. Department of Education__

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

- [ ]  I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

- [x]  II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
              740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.         for patent, trademark or copyright cases

- [ ]  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

- [ ]  IV.   220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
              690, 810, 861-865, 870, 871, 875, 900.

- [ ]  V.    150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

__N/A__

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                            YES  [ ]      NO  [x]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

                                                            YES  [ ]      NO  [x]

   if so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                            YES  [ ]      NO  [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                            YES  [ ]      NO  [x]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                            YES  [x]      NO  [ ]

   A.  If yes, in which division do all of the non-governmental parties reside?

       Eastern Division  [x]        Central Division  [ ]        Western Division  [ ]

   B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

       Eastern Division  [ ]        Central Division  [ ]        Western Division  [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                                            YES  [ ]      NO  [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME _____Thomas J. Nuttall_____

ADDRESS _Sullivan & Nuttall, P.C.   1020 Plain St. Suite 270   Marshfield, MA 02050_

TELEPHONE NO. _781-837-7428_____

(CategoryForm.wpd  - 5/2/05)