UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NORTH READING SCHOOL COMMITTEE, Plaintiff<br><br>v.<br><br>BUREAU OF SPECIAL EDUCATION APPEALS OF THE MASSACHUSETTS DEPARTMENT OF EDUCATION, MASSACHUSETTS DEPARTMENT OF EDUCATION, AND TIMOTHY AND COURTNEY GRAFTON, AS PARENTS AND NEXT FRIEND OF M.G., Defendants | Civ. No. 05-11162 RCL |

## PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Now comes the Plaintiff, North Reading School Committee, pursuant to Local Rule 56.1, and states that the following material facts are not in dispute:

### Introduction

1.   This case is an appeal pursuant to 20 U.S.C. §1415 (i)(2) of a final decision issued by the Bureau of Special Education Appeals of the Massachusetts Department of Education.

2.   An administrative hearing was held at the Bureau of Special Education Appeals on February 15, 17, 18 and March 14, 2005 in which the Defendants in the present action, Courtney and Timothy Grafton ("Parents"), sought tuition reimbursement from the North Reading School Committee for their unilateral placement of their child at a private special education school. Administrative Record ("AR") at 108-09.

3.   In her decision, the hearing officer stated "[t]his is a very close case." AR at 126. Noting that the parties agreed on the nature of the student's disability, its impact on his educational performance and the type of services necessary, the hearing officer found that the case turned on the physical/structural environment of the classrooms that "play[ed] to an identified area of weakness, namely, attention, that has the potential to undermine the rest of the Student's educational functioning." *Id.*

4.   North Reading brings this Motion for Summary Judgment on the Grounds that the hearing officer's decision must be set aside due to significant errors including (1) failure to determine whether the Parents were eligible for tuition reimbursement under 20 U.S.C.§1412(a)(10)(C); (2) failure to apply the correct standard for determining whether North Reading offered the Student a free and appropriate public education and failure to consider federal and state requirements that a Student be educated in the least restrictive environment; and (3) the Hearing Officer's failure to recognize the disputed issue was one of methodology which required a finding in favor of the District.

### The Student

5.   M.G. ("the Student") is a student residing in North Reading, Massachusetts.

6.   The parties do not dispute the Student's areas of need. AR at 110. The Student has a history of a language-based learning disability, deficits in memory and executive function and marked distractibility. *Id.* Student has a pervasive and moderate language learning disability that affects the entire spectrum of language including auditory processing, discriminating language sounds and words, storing information in short term memory, transferring information into long term memory, retrieving information, and organizing and formulating language for oral expression. *Id.* He has reading difficulties

that are consistent with a diagnosis of developmental dyslexia. *Id.* Student also has diminished attention and concentration although he has not received a firm diagnosis of ADHD. *Id.*

7.    Student's disabilities affect his ability to read, write and express himself orally, and hence to perform academically at a level commensurate with his cognitive ability. AR at 111.

### The Student's Pre-School Years at North Reading Public Schools

8.    Between the ages of twenty one (21) months and three (3) years (March 1997 to May 1998), the Student received Early Intervention services for what was first diagnosed as language delays and then as global developmental delays. AR at 111. Student had deficits in numerous domains including expressive and receptive language, play and communication skills, regulatory/sensory functioning, and the ability to sustain attention and maintain eye contact. *Id.* Early Intervention services included a toddler playgroup, a home program, and speech/language and occupational therapy. *Id.*

9.    Beginning with the Student's third birthday in May of 1998, North Reading assumed funding responsibility for Student's Early Intervention services. *Id.* In September of 1998, the Student attended North Reading's integrated pre-kindergarten program under an Individualized Education Program (IEP) that provided for speech and language therapy, consultations by speech/language and occupational therapists and eleven hours per week in the pre-kindergarten classroom. *Id.*

10.    The Student made progress in the North Reading pre-kindergarten program. *Id.* His speech and pre-academic skills improved. *Id.* By June 2001, Student had achieved his IEP goals. *Id.*

11. In June 2001, the Student's Team developed an IEP for the kindergarten school year (2001-2002). *Id.* The Student's team recommended and the IEP called for the student to attend a regular education kindergarten classroom with a number of classroom modifications as well as speech and language therapy two times per week for thirty minutes each. Record Transcript, Vol. III, at 11.

### Kindergarten at Meritor Academy (2001-2002)

12. The Parents did not respond to the IEP for the 2001-2002 school year. *Id.* Instead, they placed the Student at Meritor Academy, a private regular education school with no special education services available for students enrolled there. *Id.* at 11 & 15. The Parents decided to place the Student at Meritor Academy because they felt that Student needed a full day program instead of the half-day kindergarten available in North Reading. *Id.* at 13. The Student's mother was a substitute teacher at Meritor Academy and later became a kindergarten teacher. *Id.* at 11.

13. In late August of 2001, the Parents notified North Reading that they would be sending the Student to Meritor Academy at their own expense. AR at 112.

14. The Student attended Meritor Academy for his entire kindergarten year and received private speech therapy services after school. AR at 112.

15. Parents considered whether to use North Reading's speech and language services, but decided on private speech and language services. AR at 111-12, Record Transcript, Vol. III at 13.

16. At the end of the Student's kindergarten year, the private speech and language therapist recommended discontinuing speech and language services and retaining a

reading tutor. AR at 112. The mother never contacted North Reading for a reading tutor. Record Transcript, Vol. III, at 15.

### First Grade at Meritor Academy (2002-2003)

17. Student continued attending Meritor Academy for the first grade at parental expense. AR at 112. He continued to receive private tutoring in reading, but otherwise did not receive any special education services. *Id.*; Record Transcript, Vol. III at 17.

18. The Student's mother neither received nor initiated any contact with North Reading while the student attended kindergarten and first grade at Meritor Academy. AR at 112.

### Second Grade at Meritor Academy and
### Mid-Year Transfer to Landmark School (2003-2004)

19. In the summer of 2003 prior to the Student's second grade year, the Mother contacted the Landmark School ("Landmark"). Record Transcript, Vol. III, at 20. Landmark is a private school serving students with language based learning disabilities. AR at 118. The Landmark School referred the mother to a neuropsychologist, John E. Lappen, Ph.D. for testing. Record Transcript, Vol. I, at 20.

20. In September 2003, Dr. Lappen privately evaluated the Student. AR at 112. Parents were concerned that Student was continuing to have speech and language problems, struggling in school, and beginning to lose enthusiasm for school. *Id.*

21. On October 4, 2003, the Student's mother submitted an application to Landmark seeking admission for the Student. Record Transcript, Vol. III, at 22.

22. On December 11, 2003, the mother provided Landmark with a copy of Dr. Lappen's report. Record Transcript, Vol. III, at 24.

5

23.    On December 11, 2003, the mother brought the Student to Landmark for additional testing in conjunction with his application. Record Transcript, Vol.III, at 24.

24.    On December 12, 2003, Landmark accepted the Student for admission. *Id.* at 25-26.

25.    On December 17, 2003, a week after sending Dr. Lappen's report to Landmark and after the student had already been accepted for admission at Landmark, the mother forwarded Dr. Lappen's report to North Reading. *Id.* at 23-25.  In a cover letter, the mother requested that North Reading review Dr. Lappen's report and develop an IEP. *Id.* at 27.

26.    In response to the mother's letter, North Reading sent the mother a consent form for her signature in order for North Reading to evaluate the Student. *Id.* at 27.  Mother signed the consent form on December 24, 2003. *Id.* at 29.

27.    "[S]hortly after December 25, 2003," the mother notified Landmark that she was enrolling the Student. *Id.*

28.    In January of 2004, the Student began attending Landmark at his parents' expense. AR at 114.

### The March 2004 IEP

29.    In February of 2004, North Reading conducted psychological, educational, and speech and language evaluations, as well as an observation of the Student at Landmark. *Id.*

30.    North Reading held a team meeting on March 9, 2004 and developed an IEP. *Id.* at 115. The IEP called for placing the Student at North Reading's E.E. Little Elementary School in its Primary Language Based Program for all subjects with the exception of

science which would be presented within a mainstream classroom. *Id.* The Student would be also be mainstreamed for homeroom, art, music and physical education. *Id.* at 120.

The Proposed Classroom:

31.   North Reading's proposed classroom is a substantially separate language-based classroom. The classroom serves a total of nine students (the Student would have been the tenth) ranging in age from the Student's age to approximately two years younger. *Id.* at 120-121.

32.   The program is located in a regular sized classroom that is organized into several learning centers where children participate in a variety of educational activities in small groups, supervised by adult educators and paraprofessionals. *Id.* Thus, for example, while one group of three might be working on a literature lesson with one of the paraprofessionals, another group of three would be writing with a second paraprofessional and the third group would be doing a reading lesson with the teacher. *Id.* At hearing, the teacher described her room as follows:

> My class is a full-sized, regular education classroom in the first and second grade hallway. It is a quiet, productive classroom. The way I structure my room is in learning centers so that the class format is one in which the kids are not on top of each other. For example - - I'll be more specific - - every child has an individual desk that are in one large group. One of my centers is a moon-shaped table that faces the board. The students, when they're sitting at this particular table, their backs are to the door and they're facing the board as well as myself.
>
> Another table is rectangle-shaped table on a carpet with a large, free standing white board on one side, and the other side is a free-standing bookcase. On the other side of that book case is - - a third table - - which is a circle table, which has its own white board as well.

> . . . the structure of the classroom is one in which the tables are separated and the groups are separated by natural furniture and natural barriers. All the chairs have tennis balls on them, on the bottom of them, so - - which reduces noise greatly. . . .
>
> . . . all of the schedules occur at transitional times, meaning that children are not coming in my classroom from gym or from their math at - - in the middle of a lesson. It happens either on the hour or the half hour where we change . . .

Record Transcript, Vol. IV, at 27-28.

33. The program's teacher is Ms. Fiore. AR at 121. Carrie Lynn Fiore holds a Massachusetts Teaching Certificate in Elementary Education, Grades K-6, and Moderate Special Needs, Grades K-9. AR at 507. She is Orton-Gillingham certified, Project Read trained, Visualizing & Verbalizing trained, Lindamood Phoneme Sequencing trained (LiPS), and John Collins Writing Program trained. *Id.* Pearl Feeney –Grater is a speech and language pathologist and co-teaches particular lessons. AR at 523-25. She holds a Massachusetts and National Licensure in Speech/Language/Hearing Disorders. *Id.* Both paraprofessionals associated with the program are certified teachers, and one has a special needs certification. AR at 121.

34. The Student's program was to include daily 1:1 reading tutorial with Ms. Fiore using LiPS and eventually a rule-based decoding program like Orton-Gillingham; daily circle time, listening comprehension, speech/language, writing, a weekly social pragmatics group, math, literature, spelling, mainstream science and specials (art, music, library, gym). *Id.* Except for circle time, which is a whole class activity, Student would be in groups of three with one teacher or paraprofessional for instructional activities, within the language-based setting. *Id.*

35. The proposed IEP provided for goals in reading decoding, fluency and comprehension; spelling and written expression; math computation and application; work habits and attending skills; and expressive language. *Id.* at 241-243. The IEP provided for extensive modifications See AR at 235 & 238 (listing accommodations). Many of the accommodations focused on attentional issues. For example,

> "[student] needs to be seated near the teacher, away from other environmental distractions . . . Assist [student] in making sure his work area is clear from any unnecessary material, which may serve as a distraction . . . ask [student] to repeat important directions to be sure he is focused and understands the task prior to beginning work . . .checkpoints during independent work for remaining on task and target . . . provide access to a quiet work area within the classroom (as needed) to address attentional issues." AR at 235. "Organized, structured teaching instructions and needs to be sensitive to auditory issues . . . PRIVATE cueing – Gain his attention prior to auditory input. Preferential seating away from potential noise sources . . . "

36. The IEP contained a "Nonparticipation Justification" which is required by law 300.550(b)(2) if the student is being removed from the general education classroom at any time. That section stated: "[Student] has delays in reading skills, which require specially designed instruction. Within the Primary Language based classroom, he will be provided an individualized program, using multi-sensory techniques. [Student] would benefit from speech services to address the quality of his verbalizations. [Student] will need to receive this direct instruction outside the regular education setting to maximum benefit. [Student's] unique learning style requires the individuality and pace of the substantially separate language based classroom. AR at 245.

37. The mother rejected the IEP on May 10, 2004. *Id.* at 116, Record Transcript, Vol. III at 38.

9

38.   The Parents had the Student tested by a second neuropsychologist and a speech and language therapist in April of 2004. Mother received the report of neuropsychologist, Susan Brefach, on June 7, 2004 and the speech and language therapist, Ruth Margulies, on May 26, 2004. Record Transcript, Vol. III at 43-44.

39.   The Mother did not send either report to North Reading until September 16, 2004. *Id.* at 44.

40.   On August 20, 2004, the Parents' attorney sent North Reading a letter stating the Parents "intend to enroll [student] at Landmark for the 2004-2005 school year. They will be seeking reimbursement for all costs associated with his placement, including the cost of transportation and evaluations. They also plan to seek reimbursement for the portion of the 2003-2004 school year in which [student] attend the Landmark School." AR at 250. The attorney stated he intended to file a Request for Hearing with the Bureau of Special Education Appeals within the next two weeks. *Id.*

### Third Grade at Landmark (2004-2005)

41.   The Student continued to attend Landmark during the third grade.

42.   North Reading scheduled a team meeting for September 29, 2004 in order to review the testing of Susan Brefach and Ruth Margulies. *Id.* at 45. At the Mother's request, the meeting was postponed until October 8, 2004 and then again until December 2, 2004. *Id.* at 45-48.

43.   At a team meeting on December 2, 2004, the team developed a second IEP. The December 2004 IEP took into account recommendations made by Brefach and Margulies and contained added accommodations and modifications accordingly.

10

## The Landmark School

44. Landmark School's teachers lack experience and proper certification. There was no indication that the Student's Language Arts and Auditory/Oral Expression teacher, Tina Upton, was certified and she was a first year teacher. Record Transcript, Vol. II, at 34-37. Jay Flannery, the language arts one to one tutorial teacher has only been certified in special education for one year; is a first year teacher, and is not trained in Wilson Reading, Orton-Gillingham, or Visualization and Verbalization programs. *Id.* at 38-39. Freddie Triback, the Student's Literature teacher is not certified in special needs. *Id.* at 40. Elizabeth Mahoney, the Student's prior case manager, is not certified in special needs. *Id.* at 47. Meghan Davis, the Student's social studies/science teacher has no special needs certification or regular education certification. AR at 361. Elizabeth Gott, the Student's Auditory/Oral Expression teacher has no special needs or regular education certification. *Id.* at 363. Starry Cook, the Student's current case manager, has no certification for third grade instruction. *Id.* at 357.

45. Karl Pulkkinen, Landmark's public school liaison and former director, admitted that certification is an important qualification for a special needs teacher and also admitted that the teaching staff instructing the Student was either not certified or not certified in areas appropriate to instructing the Student. Record Transcript at 40-61.

46. With respect to her observation of the Student at Landmark, Ms. Fiore testified that there was no pre-teaching or spiraling of information. Record Transcript, Vol. III, at 77-70. Ms. Feeney-Grater testified that there were "missed opportunities" at Landmark, that there was little social interaction among and between students and staff, and that

there were times that the teachers did not engage the student with standard language based teaching techniques. *Id.* at 104-119.

47.    Student's case manager testified to staff meeting and weekly department head meetings, but admitted that the Student had never been the subject of any discussions at the meeting she attended. Record Transcript, Vol. II at 104-06.

## The Hearing and Decision

48.    A hearing was held on February 15, 17, 18 and March 14, 2005 at the Bureau of Special Education Appeals.

49.    In the decision, the Hearing Officer stated:

> This is a very close case. Student's IEP is very comprehensive, and incorporates many or most of the suggestions of both the School's and the Parents' evaluators. The lead teacher and the speech therapist for the [North Reading's] Primary Language-Based Classroom were very impressive both in terms of their backgrounds and obvious expertise and in the thought, creativity and care they have invested in both the program as a whole and Student's IEP in particular. The regular education teacher was similarly impressive.
>
> When analyzed in light of the student's unique profile, however, the proposed program for 2004-2005 was not appropriate for Student <u>at the time it was offered</u> (March and December 2004) because it did not adequately address the Student's well-documented auditory processing and attentional issues. (emphasis in original).

AR at 126.

50.    The hearing officer then includes a footnote stating:

> What makes the program inappropriate here is a physical/structural environment that "plays" to an identified area of weakness, namely, attention, that has the potential to undermine the rest of Student's educational functioning.

AR at 126 n. 9.

12

51. The decision continues:

> The weight of the evidence shows that Student is simply too easily distracted and has too many problems with auditory processing and auditory memory to be able to function successfully in a setting where multiple activities are going on within earshot. Even in the quiet relatively distraction free environment of his Landmark School classrooms, where there are no more than six students and one teacher, in small room, and all student are doing the same thing at the same time, Student requires frequent prompts to remain focused. It is hard to imagine that at least during the 2004-2005 school year, he could have remained focused in the busier setting of the language-based classroom or the mainstream science class, regardless of accommodations and strategies offered. Moreover, while it may very well be possible to modify the environment of the North Reading program to be more suitable for Student, North Reading has presented no evidence of whether and how that might be done.

AR at 126.

52. The Hearing Officer failed to find that the Landmark teachers were not properly certified to teach the Student. *Id.* at 52.

53. The Hearing Officer's decision turned on the physical/structural environment of North Reading's classroom and the Student's auditory processing and attentional issues. See supra ¶46.

54. On that issue, the Parents' expert, Susan Brefach, testified that multiple learning groups going on at the same time created auditory distractions that "constituted a significant impediment to his learning." Record Transcript, Vol. I, at 68. It was her opinion that the Student should be in a classroom where the students are "all doing the same thing at the same time to facilitate learning and retention." *Id.* at 69.

55. North Reading's experts did not agree that the structure of the classroom would create additional distractions for the Student. Ms. Fiore testified on cross-examination as follows:

> Q: Now, if I understand what you described in terms of your classroom, you've made efforts to reduce distractibility - -
> A: Yes.
> Q: - - is that right? But there are occasionally times during the day when there are three different learning centers going on?
> A: Yes.
> Q: Okay. And, again, what you've done is tried to use furniture to block off things and part - - and use different parts of the room in order to avoid - -
> A: Correct
> Q: - - the distraction? But it is - - that fact - - there is - - fact that there is (sic) instruction going on in the normal tone of voice in three different areas of the room on the same time on occasion?
> A: Correct.
> Q: Wouldn't you agree that that prevents - - that that presents a distracting situation?
> A: I think kids can be distracted any time, anywhere.
> Q: Right.
> A: So, specifically, my classroom, there are - - there are definitely times that [student] might be distracted, just like he would be in any classroom. I have other kids similar to [student's] profile, in regard to attention, and have been very successful in my classroom. Due to the small groups that I have, I'm able to - - and I observe [student]. He's very able to respond to verbal prompts. And because of that, and because he would be in a group of four, at the max, five - - excuse me - - five at the max - - during content area material, any time that he would be distracted, I'm able to bring him back. I see that with all of my children.
> Q: Wouldn't you agree, though, that if [student] were in a separate classroom, it would be less distracting than being in a classroom with two other groups happening at the same time?
> A: I can't say that because when I saw [student at Landmark], he was distracted too.

14

Record Transcript, Vol. IV, at 121-123.

> Q.   . . . But wouldn't you agree that there would be fewer distraction if there weren't two other centers going on in the room?
>
> A:   I'm not - - I can't make that generalization, only because he can be distracted by himself. He can be distracted by his pencil. Kids can be distracted by anything.
>
> Q:   I understand that. But you're telling me that you can't - - I'm not saying it would be perfect. But what I'm saying is: Wouldn't you agree that the fact that there are two centers going on in the room presents a source of distraction?
>
> [objection omitted]
>
> A:   I don't. The kids are - - the way the kids are faced towards me, and the way the kids are faced towards their teacher - - its been over a hundred days of school. They know the format of the room. They know that they're going to - - the door will open. Doesn't mean they're going to look at it every time. No, I don't.

Id. at 124.

56.   North Reading's experts did not agree that the Student needed to be in a classroom in which all the students were doing the same thing at the same time. See id. at 121-124, 141-142 (testimony of Ms. Fiore); Record Transcript, Vol. III, at 198-202 (testimony of Ms. Feeney-Grater). Ms. Pearl Feeney-Grater explained on cross examination that by employing appropriate modifications and accommodations the adult is modifying the environment, so that listening and learning can take place, and so that the child learns internal compensatory strategies; how to adapt, self-regulate, and self-advocate:

> Q:   Going back to [student's] need to be free from distractions and to have a situation where he can

15

|       |       |
|---|---|
|       | concentrate, how that that environment be conducive to that, to [student]? |
| A:    | The science lesson is hands-on. It's very visual. It's – it's— science is rolling up your sleeves and getting involved. It's not so much the task of listening, but the task of doing. That's something that there's a trump card for, for [student], from what I know of him and have read through his testing. When he can involve himself, when he can touch, feel, see he does much better. . . . |
| Q:    | Okay. But you do - - again, you recognize in your assessment that [student] is going to have some problems in concentration? |
| A:    | [Student] can be distracted. |
| Q:    | And he's going to have problems in auditory processing when there are other - - just auditory distractions in the classroom? |
| A:    | Right. However, you make accommodations for that, and those accommodations have been clearly outlined in the educational plan. |
| Q:    | And those are accommodations, again, primarily in the form of the methodology that's employed - - and I guess maybe I'm using it improperly - - but repetition, recuing, short simple sentences? |
| A:    | Even more than that. Checking for confirmation. |
| Q:    | Um-hum. |
| A:    | Periodically seeing if what you have said to him, is he following through on it. If there's a written lesson needing to be done when you give a direction, looking the he's done the first one correctly, then down the page he goes. |
| Q:    | When have you - - |
| A:    | So there's many more accommodations, than just repetition ands what you just mentioned. |
| Q:    | Certainly. Wouldn't it be more efficient, though, to provide an atmosphere that was free of distraction, rather than have to make accommodations for distraction that are inherent in the environment? |
| A:    | There are some activities in which that may be true. But we need to look at the big picture here of where we're bringing him as a learner. You can initially make all the accommodations that he needs and that he deserves and rightly so, but there will come a time in which - - for the sake of self regulation - - |

16

|     |     |
| --- | --- |
|     | that he will need to be aware of what does and what doesn't work for him and to be able to advocate for himself as to when something's not working, whether it's too noisy, too fast, too much information, et cetera, et cetera. So there's going to be a place in time when it will be important for him to be exposed to situations that may challenge him, making sure the adult in the environment is watching, to make sure it is not interfering with his - - with his performance. And if, indeed, it is, then we make the accommodation that he needs. But the whole goal of learning is to be able to - - to integrate and to become automatic in your own learning. |
| Q:  | I don't think anyone would disagree with what you said. But wouldn't you agree that until you acquire some basic ability to be able to process the information, throwing yourself into the shark tank to swim with the shark would be a mistake? |
| A:  | I would tell you that we would never, as an educator, throw any child to the shark tank. We should be shot if we do that. Fire me now. |
| Q:  | To put it in a little less graphic terms, I guess, certainly some basic level of being able to do the auditory process is going to be necessary before you can embark on the challenging - - challenges of an atmosphere that is more like the real world? |
| A:  | When you use the words, "do the auditory" processing, you are never teaching a child to quote, "do auditory processing." You are teaching the child how to – two things happen: The adult is accommodating the environment, so that listening/learning can take place; on the other hand, you're teaching a child how to make adaptations for himself or herself and how to regulate and how to advocate for what does and doesn't work. That is the ultimate. |

Record Transcript, Vol.III, at 198-202.

Date: April 8, 2006    Respectfully submitted,

The Plaintiff,

North Reading School Committee,

By its attorneys,

SULLIVAN & NUTTALL, P.C.

/s/ Thomas J. Nuttall
_____
Thomas J. Nuttall
BBO No.: 546940
1020 Plain Street, Suite 270
Marshfield, MA 02050
(781) 837-7428

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.

Date:    /s/Thomas J. Nuttall
_____
Thomas J. Nuttall

18