UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NORTH READING SCHOOL
COMMITTEE, Plaintiff

v.

BUREAU OF SPECIAL EDUCATION                    Civ. No. 05-11162 RCL
APPEALS OF THE MASSACHUSETTS
DEPARTMENT OF EDUCATION,
MASSACHUSETTS DEPARTMENT OF
EDUCATION, AND TIMOTHY AND
COURTNEY GRAFTON, AS PARENTS
AND NEXT FRIEND OF M.G.,
Defendants

## MEMORANDUM OF LAW IN SUPPORT OF NORTH READING
## SCHOOL COMMITTEE'S MOTION FOR SUMMARY JUDGMENT

### STATEMENT OF THE CASE

This is a case in which the North Reading School Committee ("North Reading" or

"District") seeks judicial review pursuant to 20 U.S.C.§1415(1)(2) of a final decision

issued by the Bureau of Special Education Appeals of the Massachusetts Department of

Education. The Hearing Officer's decision was contrary to law, unsupported by the

weight of the evidence and contained significant errors. Those errors include (1) failure to

determine whether the Parents were eligible for tuition reimbursement under 20

U.S.C.§1412(a)(10)(C); (2) failure to apply the correct standard for determining whether

North Reading offered the Student a free and appropriate public education and failure to

consider federal and state requirements that a Student be educated in the least restrictive

environment; (3) failure to recognize the disputed issue was one of methodology which

required a finding in favor of the District; and (4) the Hearing Officer's failure to find that Landmark was not appropriate. Those errors warrant this Court setting aside the Hearing Officer's decision and entering judgment in favor of North Reading.

## ARGUMENT

### I.    THE STANDARD OF JUDICIAL REVIEW

The Individuals with Disabilities Education Act ("IDEA") provides that in actions involving appeals from administrative decisions, a federal district court (i) shall receive the records of the administrative proceeding; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. §1415 (i)(1)(C).  The First Circuit Court of Appeals has interpreted the statutory language of the IDEA to require:

> an intermediary standard of review . . . a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review.

*Shawsheen Valley Reg. Tech. Sch. v. Com.*, 367 F. Supp. 2d 44, 49 (D. Mass. 2005) (citing *Lenn v. Portland Sch. Comm.*, 998 F. 2d 1083, 1086 (1st Cir. 1993)).  A federal trial court,

> in recognition of the expertise of the administrative agency, must consider the agency's findings carefully and endeavor to respond to the hearing officer's resolution of each material issue.  After such consideration, the court is free to accept or reject the findings in part or in whole.

*Id.* (citing *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985)).

2

An agency's legal conclusions, however, are subject to de novo review. *Id.* (citing *Ross v. Framingham Sch. Comm.*, 44 F.Supp.2d 104, 111 (D. Mass. 1999)). Likewise, an agency's finding on a mixed question of fact and law cannot stand if it is based on an error of law. *Id.*

II.    **THE PARENTS ARE NOT ENTITLED TO REIMBURSEMENT PURSUANT TO 20 U.S.C §1412 (a)(10)(C)**

In *Burlington v. Department of Education*, 471 U.S. 359, 369 (1985), the United States Supreme Court held that the IDEA authorized the equitable remedy of tuition reimbursement. Following *Burlington*, however, there was uncertainty among courts with respect to the circumstances under which tuition reimbursement was available. See *Greenland School District v. Amy N.*, 358 F.3d 150, 159 (2004)(discussing history of tuition reimbursement to parents for unilateral placement at private schools under IDEA).

In 1997, Congress significantly amended the IDEA to clarify those circumstances.[1] *Id.* The 1997 Amendments limited the circumstances in which parents who have unilaterally placed their child in a private school are entitled to reimbursement for that placement. 20 U.S.C. §1412(a)(10)(C); *Greenland School District v. Amy N.*, 358 F.3d at 152. The Amendments reinforced the principal that children should not be removed unnecessarily from regular education environments, in part by eliminating "inappropriate financial incentives for referring children to special education." *See Greenland School District v. Amy N.*, 358 F.3d at 152 (citing H.R. Rep. 105-95 at 90 (1997)). One specific purpose of the 1997 Amendments was to control government expenditures for students voluntarily placed in private schools by their parents. *Id.*

---

[1] The IDEA was most recently amended in 2004. The sections relevant to this case involving the 1997 amendments were not changed by the 2004 amendments.

3

The IDEA divides children attending private school into two categories: children enrolled in private schools by their parents and children placed in or referred to private schools by public agencies. 20 U.S.C. §1412(a)(10)(A) and (B).    20 U.S.C. §1412(a)(10)(C) governs when tuition reimbursement is available to parents who place their child in a private school without consent of the local school district.[2]

In *Greenland School District v. Amy N.*, the First Circuit provided a thorough and instructive analysis of the 1997 amendments. In analyzing 20 U.S.C. §1412(a)(10)(C), the *Greenland* court stated that the statutory language set forth a "threshold requirement" that:

> tuition reimbursement is only available for children who have previously received 'special education and related services' while in the public school system (or perhaps those who at least timely requested such services while the child is in public school.)

358 F.3d at 159-60.    The 1997 Amendments also implemented "several additional limitations on reimbursement." *Id.* at 160. "[R]eimbursement may be denied or reduced if the parents do not give the school district notice of their intent to remove their child from public school before they do so." *Id.* "That notice can be provided either at the

---

[2] That section provides:

> (C) Payment for Education of Children Enrolled in Private Schools Without Consent of or Referral by the Public Agency.
> (i) In General. Subject to subparagraph (A), this part does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free and appropriate public education available to the child and the parents elected to place the child in such private school or facility.
> (ii) Reimbursement for Private School Placement. If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

4

most recent IEP meeting that the parents attended prior to removal of the child from

public school" or by written notice ten business days prior to such removal. *Id.* (citing 20

U.S.C. §1412(a)(10)(C)(iii)(I)).[3]  The *Greenland* court emphasized:

> These statutory provisions make clear Congress's intent
> that <u>before</u> parents place their child in private school, they
> must at least give notice to the school that special education
> is at issue. This serves the important purpose of giving the
> school system an opportunity, before the child is removed,
> to assemble a team, evaluate the child, devise an
> appropriate plan, and determine whether a free appropriate
> public education can be provided in the public schools.

*Greenland School District v. Amy N.*, 358 F.3d at 160 (emphasis in original).

The facts in *Greenland* are analogous to the present case.  The court addressed

whether the parents of Katie, a special education student, were entitled to reimbursement

from the Greenland, New Hampshire school district for Katie's tuition at a private special

needs school.  *Id.* at 152.  In that case, the student began first grade in the Greenland

---

[3] The section provides in full:

> (iii) Limitation on Reimbursement.  The cost of reimbursement described in
> clause (ii) may be reduced or denied –
> > (I) if –
> > (aa) at the most recent IEP meeting that the parents attended prior to
> > removal of the child from the public school, the parents did not inform
> > the IEP team that they were rejecting the placement proposed by the
> > public agency to provide a free appropriate public education to their
> > child, including stating their concerns and their intent to enroll their
> > child in a private school at public expense; or
> > (bb) 10 business days (including any holiday that occurs on a business
> > day) prior to the removal of the child from the public school, the
> > parents did not give written notice to the public agency of the
> > information described in item(aa);
> > > (II) if, prior to the parents' removal of the child from the
> > > public school, the public agency informed the parents, through
> > > the notice requirement described in section 1415(b)(3) of this
> > > title, of its intent to evaluate the child (including a statement of
> > > the purpose of the evaluation that was appropriate and
> > > reasonable), but the parent did not make the child available for
> > > such evaluation; or
> > > (III) upon a judicial finding of unreasonableness with respect
> > > to actions taken by the parents.

5

Public Schools. *Id.* Katie's first grade teacher noticed that she had difficulty focusing and was easily distracted. *Id.* Her parents took her to a private psychologist who diagnosed her with Attention Deficit Hyperactivity Disorder. Her psychiatrist recommended a number of practical accommodations for Katie, such as providing her with checklists and seating her in the front of the classroom. Katie continued in regular education in the Greenland School District until the fourth grade. *Id.* at 153. At no point during Katie's years in the Greenland School District did her parents or any of her teachers request that she be evaluated for special education services. *Id.*

The summer after Katie's fourth grade year, her parents unilaterally removed her from the Greenland Central School and enrolled her at a private regular education school. *Id.* When her parents removed her from the school system, they "were not looking for special education." *Id.* In the fifth grade, Katie's parents withdrew her from the private regular education school in February and placed her in the Learning Skills Academy, a private special education school. *Id.* At approximately the same time that Katie started at the Learning Skills Academy, her parents contacted the Greenland School District and requested that Katie be evaluated for special education services. *Id.* at 154. This was the Parent's first notice to Greenland that their daughter may need special education services. *Id.*

The district performed a battery of tests and determined that Katie's ADHD did not adversely affect her educational performance and concluded she did not have a learning disability. *Id.* The parents disagreed and requested an independent evaluation. *Id.* That evaluation concluded that Katie had Asperger's disorder and the school district then found her eligible. *Id.* at 154-55. The school district developed an IEP which called

6

for Katie to attend the public school. *Id.* at 155. As the final details of the IEP were being worked out, Katie's parents requested a due process hearing. *Id.* The parents sought tuition reimbursement for Katie's spring semester of fifth grade and for her sixth grade year. *Id.*

In reviewing the case, the First Circuit stated that because Katie was enrolled in a private school at the time her parents requested a due process hearing, her rights under the IDEA were governed by 20 U.S.C. §1412(a)(10). *Id.* at 157. In determining whether her parents were entitled to reimbursement, the court stated that when Katie's parents removed her from the public school system, the parents were "not even looking" for special education services. *Id.* at 161. The court found insufficient notice where the parents had never raised the issue of special education before removing Katie from the public schools. *Id.* In discussing the accompanying federal regulations, the court stated the regulations suggest that a child who is removed from her school without her parents or the school questioning the availability of FAPE cannot be within the category of children eligible for tuition reimbursement. *Id.*

Katie's parents argued that even if they did not give sufficient notice to the district for Katie's fifth grade year, they did provide sufficient notice that Katie would be attending the Learning Skills Academy for the sixth grade year. *Id.* The court rejected that argument, stating that the parents' notice that Katie would be attending the Learning Skills Academy for the sixth grade was "besides the point." *Id.* "The purpose of the notice requirement is to give public school districts the opportunity to provide FAPE before a child leaves the public school and enrolls in the private school. *Id.* Finally, the court emphasized that "parents who unilaterally change their child's placement  . . .

without the consent of the state or local school officials, do so at their own financial risk." *See id.* at 162 (citing *Burlington v. Dep't of Educ.*, 471 U.S. at 373-74).

In the present case, the Student was placed in a private school by his Parents and therefore 20 U.S.C. §1412(a)(10)(C) applies. There is no dispute that the Parents removed the Student from the North Reading Public Schools when they placed the Student at Meritor Academy, a private regular education school, for his kindergarten year. There is also no dispute that the Parents removed the Student for reasons not related to special education or whether the Student was receiving FAPE. The Parents placed the Student in a regular education private school for kindergarten. They testified at the hearing that they were looking for a full day program. Furthermore, they chose a private school that offered no special education services and declined the speech and language services offered by North Reading. Clearly, at the time that the Student's parents removed him from the North Reading public schools, FAPE was not at issue.

The Student was enrolled at Meritor Academy for kindergarten, first grade and half of second grade. During that time, the Parents never notified North Reading that special education was at issue until the Parents forwarded Dr. Lappen's report to North Reading on December 17, 2003 and requested that North Reading develop an IEP for the Student. By that time, however, the Student had already been accepted at Landmark. The Parents first contacted the Landmark School during the summer of 2003. They made an application and visited the school in October 2003 and made the student available for additional testing in early December. On December 12, 2003, the Student was accepted for admission. It was not until this process was complete that the Parents forwarded Dr. Lappen's report to North Reading and requested that North Reading develop an IEP.

8

Clearly, the Parents had no intention of enrolling the Student in the public school as demonstrated by the undisputed facts that they moved him from Meritor Academy directly to Landmark and only turned their attention to North Reading after his acceptance from Landmark. The Parents interest in the North Reading public schools was merely to secure public funding for the Student's private school. 20 U.S.C. (a)(10(C) is intended to prevent "the FAPE process from being converted to a program for funding private tuition for parents who have demonstrated no commitment to the public school system" by imposing as a condition for reimbursement the child's initial enrollment in a public school." *See Baltimore City Board of School Commissioners v. Taylorch*, 395 F.Supp. 246, 250 (D. Md. 2005)(following *Greenland*, finding district did not provide FAPE, but parents not entitled to reimbursement because Student was enrolled in two private schools before her parents made any request for enrollment in the public school).

Secondly, the Parents did not provide the district with notice as required by 20 U.S.C. §1412(a)(10)(C)(iii)(aa) or (bb). That section requires the parents to give notice of their intention to remove the child from the school district at the most recent IEP meeting attended by the parents or ten business days prior to removing the child. Here, the parents did neither prior to removing the child from public school. Where the Parents never even raised the issue of special education before removing the child from public school and the Parents have failed to provide the district with adequate notice, the Parents are not eligible for tuition reimbursement. See *Greenland School District v. Amy N.*, 358 F.3d at 161 (denying tuition reimbursement).

9

The Student's parents may argue that they gave notice to North Reading in August of 2004 with respect to the 2004-2005 school year. In *Greenland*, however, the Court rejected this very argument. Once the child is removed from the public schools, the Parents' notice "was beside the point." *Greenland School District v. Amy N.*, 358 F.3d at 161. "The purpose of the notice requirement is to give public school districts the opportunity to provide FAPE *before* a child leaves public school and enrolls in private school." *Id.* at 161-62 (emphasis added). Subsequent notice after removal does little good. *Id.* The provision in the statute ensures that a parent's rejection of a public school placement is not based on mere speculation as to whether the recommended public school placement would have been appropriate. *See Board of Educ. of the City School Dist. of the City of New York v. Tom F.*, 2005 WL22866, 3 (S.D.N.Y.)(following *Greenland* in its conclusion that tuition reimbursement limited to children who have previously received special education and related services while in the public school system).

The hearing officer in this case erred in failing to consider as a threshold matter whether the Parents were eligible for tuition reimbursement under 20 U.S.C. §1412 (a)(10)(C) and whether the Parents provided proper notice to the school district prior to removing the Student from public school. Clearly, if the hearing officer had done so, the only conclusion she could have reached was that the parents were not eligible for tuition reimbursement. The hearing officer should have asked, "whether the parents, before they removed their child from the public school by placing him at Landmark, gave notice to the school that special education was at issue and allowed the district to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a free appropriate public education can be provided in the public schools." See *Greenland School District*

10

*v. Amy N.* 358 F.3d at 160 (setting forth threshold requirement for tuition reimbursement); *see also Ms. M v. Portland School Committee*, 360 F.3d 267 (1st Cir. 2004) (denying tuition reimbursement for unilateral placement because parent removed student without notifying the school and giving school an opportunity to respond). Here, the Parents did not give North Reading any opportunity to consider whether the Student could receive FAPE in North Reading before enrolling him at the Landmark School. Tuition reimbursement, therefore, is not available as a matter of law. Accordingly, the hearing officer's decision must be set aside.[4]

Significantly, the hearing officer's decision demonstrates exactly the result Congress sought to avoid in adopting the 1997 Amendments. After stating "what makes the program inappropriate here is a physical/structural environment that 'plays' to an identified area of weakness, namely, attention, that has the potential to undermine the rest of Student's educational functioning," the hearing officer states "*it is hard to imagine* that . . . [the student] could have remained focused in the busier setting of the [North Reading's] language based classroom or the mainstream science class, regardless of accommodations and strategies offered." AR at 126 (emphasis added). Here, the hearing officer has based her decision on speculation as to whether the accommodations and modification proposed by North Reading would have benefited the student. The provision set forth in 20 U.S.C. §1412(a)(10)(C), which is designed to allow school districts the opportunity to provide FAPE before a child leaves public school and enrolls in private school, ensures that a parent's rejection (or in this case the hearing officer's rejection) of the public school placement is not based on mere speculation as to whether

---

[4] Although neither the parties nor the hearing officer addressed 20 U.S.C. §1412(a)(10)(c) at the hearing, this court's review of the legal issues is de novo. *Manchester School District v. Crisman*, 306 F.3d 1, 9 (2003). The statute is clearly applicable and the hearing officer's failure to apply it is error.

11

the recommended public school placement would have been appropriate. *See Board of Educ. v. Tom F.*, (SDNY 2005)(following *Greenland*).

III.    <u>EVEN IF THIS COURT FINDS PARENTS ELIGIBLE FOR REIMBURSEMENT, THE HEARING OFFICER'S DECISION MUST BE SET ASIDE BECAUSE NORTH READING PROVIDED FAPE</u>

       A.    <u>The Hearing Officer Applied an Improper Standard in Analyzing Whether North Reading Offered the Student a Free and Appropriate Public Education</u>

The IDEA requires States that receive federal special education funds to provide all handicapped children in their jurisdiction with a "free and appropriate public education ("FAPE"). 20 U.S.C. §1415(a); 20 U.S.C. §1401(9). "Appropriate" in this context requires that the instructional plan be custom tailored to address the handicapped child's 'unique needs' in a way "reasonably calculated to enable the child to receive educational benefits." *Lenn v. Portland School Committee*, 998 F.2d 1083, 1086 (1st Cir. 1993) (citing *Board of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)). The IDEA emphasizes "appropriate" and "adequate" education rather than ideal and optimal. *Id.*

The First Circuit has interpreted an "appropriate" IEP to be one that is reasonably calculated to confer "some educational benefit" on the child. *Id.* (citing *Board of Educ. v. Rowley*, 458 U.S. at 198; and *Roland M. v. Concord School Committee*, 910 F.2d 983, 992 (1st Cir. 1990)). The standard is commensurate with Congress' intent of "effective results" and "demonstrable improvement" for children receiving special education. *Roland M. v. Concord School Committee*, 910 F. 2d at 991 (citing *Burlington v. Dept of Educ.*, 736 F.2d 773, 788 (1st Cir. 1984).

In analyzing this case, the hearing officer misstates the standard employed by the First Circuit in determining whether the IEP confers sufficient educational benefits to

satisfy the requirements of FAPE. *See* AR at 124 (stating IDEA requires opportunity for meaningful educational benefit). The hearing officer states that FAPE requires that an IEP be reasonably calculated to confer "meaningful benefit" and cites to *Lenn v. Portland School District*, 998 F.2d at 1091 and *G.D. v. Westmoreland School District*, 930 F.2d 942 (1991). Neither case cited, however, speaks of "meaningful" benefit. To the contrary, in *Lenn v. Portland School District*, the court states "an IEP must afford *some* educational benefit to the handicapped child . . ." 998 F.2d at 1086 (emphasis added). *G.D. v. Westmoreland School District*, does not state or even suggest that FAPE requires anything greater than "a reasonable probability of educational benefits." 930 F.2d at 948.

The distinction is significant, especially in a "close case." AR at 126. "Meaningful" is a subjective term whereas "some" is quantifiable. Accordingly, an IEP that provides "some" benefit is one that is reasonably calculated to enable the child to achieve passing marks and advance from grade to grade; such an IEP will be found to be adequate. *Lenn v. Portland School Committee*, 998 F.2d at1087 (citing *Board of Education v. Rowley*, 458 U.S. at 203. Likewise, an IEP that "would likely achieve measured success" will be found to be adequate. *Id.* at 1091. Where the Hearing Officer's conclusion that North Reading's IEP did not "adequately" address the student's attentional and auditory processing issues is clearly subjective and based on an error of law, her conclusion cannot stand.[5]

---

[5] The Supreme Court has acknowledged that the question of when a child is receiving sufficient educational benefits to satisfy the requirements of FAPE presents a "difficult problem." *Board of Educ. v. Rowley*, 458 U.S. at 202. In noting that "the Act requires participating States to educate handicapped children with nonhandicapped children whenever possible," the Court found that when a child is educated in the public school system, the system itself monitors the educational progress of the child through testing, grades and promotion. *Id.* at 202-203. "The grading system and advancement system thus constitutes an important factor in determining educational benefit." *Id.* at 203. An IEP that is reasonably calculated to enable the child to achieve passing marks and advance from grade to grade will satisfy the IDEA. *Id.*

13

Applying the proper legal standard to North Reading's IEP, it is clear that the IEP adequately addressed the Student's auditory processing and attentional issues. The IEP provided for numerous accommodations designed to modify the environment for the Student so that listening and learning can take place and so that the Student could learn and internalize compensatory strategies, including the ability to adapt to his environment, self-regulate and self-advocate.[6] North Reading provided testimony from the classroom teacher, the speech and language pathologist and regular education science teacher with respect to how North Reading's program would address his auditory processing and attentional issues. As the Hearing Officer found the IEP adequate in all other respects and the record is replete with evidence that the IEP addressed the student's auditory processing and attentional issues, this court ought to find that the IEP adequately addressed the student's auditory processing and attentional issues.

Finally, the Hearing Officer erred in concluding that "while it may very well be possible to modify the environment of the North Reading program to be more suitable for Student, North Reading has presented no evidence on whether and how that might be

_____

As explained above in Section II of this memorandum, the Student never attended public school during the time period at issue and therefore there is no record of the Student's progress in public school. The Parents removal of the Student from the public school prejudiced North Reading's opportunity to provide the Student with FAPE prior to his enrollment at Landmark. As such, the hearing officer's decision that the IEP was not adequate was based on subjective speculation as to whether he could have focused in North Reading's program. See AR at 126 (stating "*it is hard to imagine* that . . . he could have remained focused")(emphasis added).

[6] The IEPs modifications include:
"[student] needs to be seated near the teacher, away from other environmental distractions . . . Assist [student] in making sure his work area is clear from any unnecessary material, which may serve as a distraction . . . ask [student] to repeat important directions to be sure he is focused and understands the task prior to beginning work  . . .checkpoints during independent work for remaining on task and target  . . . provide access to a quiet work area within the classroom (as needed) to address attentional issues." AR at 235. "Organized, structured teaching instructions and needs to be sensitive to auditory issues . . . PRIVATE cueing – Gain his attention prior to auditory input. Preferential seating away from potential noise sources . . . "
See Concise Statement of Facts, ¶35.

14

done." AR at 126. Clearly, as stated above, there is more than ample evidence in the record on the issue of how North Reading would modifiy the environment to accommodate the Student's needs. Where the Hearing Officer's conclusion is not supported by the evidence, the decision cannot stand.

B.   The Hearing Officer did not consider the IDEA's requirement that disabled students be educated with non-disabled students to the maximum extent appropriate.

The educational benefit conferred on the student, however, is only half of the equation in determining whether a particular student's IEP provides FAPE. *See Roland M. v Concord School Committee*, 910 F. 2d at 993 (stating educational benefit and least restrictive environment operate in tandem). The IDEA requires not only that the IEP be reasonably calculated to confer some educational benefit, but also that to the maximum extent appropriate, a disabled child must be educated with children who are not disabled. 20 U.S.C. §1412 (a)(5). Federal and state law dictate a policy of mainstreaming. *Id.*; 300 C.F.R. 550; M.G.L. c. 71B, §3; 603 C.M.R. 28.06(2)(c).

Parents "are free to make private educational choices solely to maximize their child's academic progress, but the public schools, state agencies and courts charged with administering and enforcing the IDEA do not enjoy the same liberty. *Aman v. Stow School System*, 982 F.2d 644, 650 (1st Cir. 1992). Special education services must be provided through the local public school system except where the resources of those schools cannot appropriately meet the child's needs. *Committee of Franklin v. Commissioner of Education*, 17 Mass. App. Ct. 683, 697 (1984). To determine a particular child's placement, the desirability of mainstreaming must be weighed in concert with the IDEA's mandate for educational progress. *Roland M. v. Concord School*

15

*Committee*, 910 F.2d at 993. The process requires a balancing between academic progress and the least restrictive environment. *Id.* "Mainstreaming may not be ignored, even to fulfill substantive educational criteria." *Id.*

The Hearing Officer found that the North Reading program was inappropriate solely because of the physical and structural environment of the classroom, but failed to balance this finding against the law's mainstreaming requirements. *See Roland M. v. Concord School Committee*, 910 F.2d at 993 (discussing IDEA's balancing requirement between educational benefit and least restrictive environment). Such an integral aspect of the analysis cannot be ignored when judging the program's overall adequacy and appropriateness. *Lenn v. Portland School Committee*, 998 F.2d at 1090 n. 7. Although the Hearing Officer recites the law on least restrictive environment, considerations of the actual least restrictive environment are completely absent from her FAPE analysis.

North Reading's program called for the Student to be included in regular education for homeroom, art, music, physical education and science. In contrast, Landmark provided no opportunities for mainstreaming and completely segregates the Student from his non-disabled peers. The Hearing Officer provided no justification for isolating him from typical peers in the public school setting. There was no evidence that the Student should not be in a public school setting. In fact, there was testimony from the Student's mother as to the Student's considerable social involvement with regular education peers in community related athletic programs and that he was well liked by his peers, very social and got along well with other children and adults. Record Transcript, Vol. III. at 5, 6; Vol. II at 127. Where North Reading's IEP addressed the Student's auditory processing and attentional issue and provided the Student with the opportunity to

16

be educated with his non-disabled peers, the hearing officer should have found the IEP to be appropriate. *See Roland M. v. Concord School Committee*, 910 F.2d at 993 (stating appropriate IEP is one that strikes an adequate and appropriate balance between academic results and least restrictive environment). Moreover, mainstreaming in the public school setting is the preferred approach. 20 U.S.C. §1412(5); *Board of Education v. Rowley*, 458 U.S. at 202; *Lenn v. Portland School Committee*, 998 F.2d at 1092 n. 12.

IV.     QUESTIONS OF METHODOLOGY MUST BE RESOLVED IN FAVOR OF THE DISTRICT

This Court should find that the Hearing Officer's Order was in error because the dispute was essentially one of methodology and courts must grant substantial deference to the decisions of local school officials on questions of methodology. *Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988).

In *Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290 (7th Cir. 1988), the leading case on methodology, the court stated that where the dispute centers on the most appropriate method to facilitate a student's special education,

> courts must be careful to avoid imposing their view of preferable education methods. The primary responsibility for formulating the education to be accorded to a disabled child and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local agencies in cooperation with the parents and guardians of the child . . .[I]t seems highly unlikely that Congress intended courts to overturn a State's choice of appropriate educational theories . . .

*See id.* at 297 (citing *Rowley*, 458 U.S. at 207-08). "Rowley and its progeny leave no doubt that parents, no matter how well-motivated, do not have a right under the [IDEA] to compel a school district to provide a specific program or employ a specific

17

methodology in providing for the education of their handicapped child." *See id.* (citing

*Rowley* and cases following *Rowley*).

In *Roland M. v. Concord School Committee*, 910 F.2d 983, 992 (1ˢᵗ Cir. 1990),

cert. denied, 499 U.S. 912 (1991), the First Circuit citing to *Lachman* and *Rowley,* stated

> Beyond the broad questions of a student's general
> capabilities and whether an educational plan identifies and
> addresses his or her basic needs, courts should be loathe to
> intrude very far into interstitial details or to become
> embroiled in captious disputes as to the precise efficacy of
> different instructional programs.

Applying that legal standard to this case, the Hearing Officer was compelled to

find in favor of the District.  The Hearing Officer's concern centers on the most

appropriate method for educating a Student with auditory processing and attentional

issues.  At issue was North Reading's classroom which is organized into several learning

centers so that more than one small group of children can work on different activities at

the same time, and in which the physical environment is modified and the staff uses

different strategies and accommodations to address the Student's attentional issues and

learning needs.  By contrast, Landmark relies solely upon its use of a small group setting

to address attentional issues, and provides no exposure to mainstream settings to permit

the child to utilize any attentional strategies within a more normalized environment .

It was the opinion of the Parents' witnesses that multiple learning centers created

too many distractions and that the Student needed a distraction free environment in which

to learn.   North Reading's witnesses, professional educators and related services

18

providers, did not agree.[7] They testified that their goal is to provide the student with the necessary accommodations clearly outlined in the Student's IEP.  By dividing the students into small groups, the teacher can seat the students facing her, and provide verbal prompts to redirect the student when he does become distracted. They testified to teaching methods such as recuing, repetition, and periodically checking for confirmation, all of which are appropriate accommodations to address a student's attentional issues. Rather than isolate the Student, North Reading's witnesses testified to looking "at the big picture."

Q:    Certainly.  Wouldn't it be more efficient, though, to provide an atmosphere that was free of distraction, rather than have to make accommodations for distraction that are inherent in the environment?

A:    There are some activities in which that may be true.  But we need to look at the big picture here of where we're bringing him as a learner.  You can initially make all the accommodations that he needs and that he deserves and rightly so, but there will come a time in which - - for the sake of self regulation - - that he will need to be aware of what does and what doesn't work for him and to be able to advocate for himself as to when something's not working, whether it's too noisy, too fast, too much information, et cetera, et cetera.  So there's going to be a place in time when it will be important for him to be exposed to situations that may challenge him, making sure the adult in the environment is watching, to make sure it is not interfering with his - - with his performance. And if, indeed, it is, then we make the accommodation that he needs.  But the whole goal of learning is to be able to - - to integrate and to become automatic in your own learning.

As the Hearing Officer framed the dispute as being centered on the appropriate methodology to employ to address attentional issues, the Hearing Officer should have resolved that dispute in favor of the methodology chosen by the District.

---

[7] Ms. Fiore, testified that she did not agree that the Student would be less distracted in a separate classroom than in a classroom with multiple learning centers because when she observed the Student in the classroom at Landmark, he was distracted there as well.

19

V.   THE LANDMARK SCHOOL IS INAPPROPRIATE FOR THE STUDENT IN
     THAT THE TEACHING STAFF DOES NOT POSSESS THE MINIMUM
     STATE RECOGNIZED CERTIFICATION TO PROVIDE SPECIAL NEEDS
     INSTRUCTION

        The Landmark School teachers lacked the necessary experience and proper

certification to teach the Student. See Concise Statement of Facts, ¶44. The Hearing

Officer found that Landmark's teachers were "certified for different age groups" than the

Student's age and "that others had certifications pending." AR at 119. Inexplicably, the

Hearing Officer failed to note, however, that certification for other age groups and

pending certifications is the equivalent of being uncertified. Massachusetts requires

teacher certification to ensure that teachers deliver quality instruction to students. Karl

Pulkkinen, Landmark's public school liaison, admitted that certification is an important

qualification for a special needs teacher in that it demonstrates at least a minimum

competency to meet the needs of a particular student population and also admitted that

the teaching staff instructing the Student at Landmark were not certified at all or not

certified in areas appropriate to instructing the Student. Record Transcript at 40-61.

Where Landmark's teachers were not qualified to instruct the Student under

Massachusetts state teaching requirements, especially where this Student required

specialized instruction, the Hearing Officer should have found that Landmark was not an

appropriate placement.

        In contrast, the Hearing Officer was impressed with the qualifications and abilities

of the North Reading teachers. The decision states, "[t]he lead teacher and the speech

therapist for the [North Reading's] Primary Language-Based Classroom were very

impressive both in terms of their backgrounds and obvious expertise and in the thought,

creativity and care they have invested in both the program as a whole and Student's IEP

in particular. The regular education teacher was similarly impressive." AR at 126. In observing the Student at Landmark, North Reading's witnesses saw "missed opportunities" to address and remediate the Student's learning disabilities. For example, Ms. Fiore testified that there was no pre-teaching or spiraling of information. Record Transcript, Vol. III, at 77-70. Ms. Feeney-Grater testified that there was little social interaction among and between students and staff, and that there were times that the teachers did not engage the student with standard language based teaching techniques. *Id.* at 104-119. Plainly, the failure of the Landmark Staff to properly address the Student's issues is a reflection of their lack of appropriate certification and experience.

Finally, there was no coordination among the Student's teachers and service providers. Student's case manager testified to staff meeting and weekly department head meetings, but admitted that the Student had never been the subject of any discussions at any meeting she attended. Record Transcript, Vol. II at 104-06. For the foregoing reasons and for the reason that Landmark provides no opportunities for mainstreaming, the Hearing Officer should have found that the Landmark program was not appropriate.

## CONCLUSION

For the above stated reasons, this Court should find that the Hearing Officer's decision was contrary to law, unsupported by the weight of the evidence and contained significant errors. Those errors include (1) failure to determine whether the Parents were eligible for tuition reimbursement under 20 U.S.C.§1412(a)(10)(C); (2) failure to apply the correct standard for determining whether North Reading offered the Student a free and appropriate public education and failure to consider federal and state requirements that a Student be educated in the least restrictive environment; (3) the Hearing Officer's

21

failure to recognize the disputed issue was one of methodology which required a finding in favor of the District; and (4) the Hearing Officer's failure to find that Landmark was not appropriate.

WHEREFORE the Plaintiff respectfully requests that this court grant its Motion and enter judgment in its favor.

Date:   April 8, 2005                    Respectfully submitted,

                                         The Plaintiff,

                                         North Reading School Committee

                                         By its attorneys,

                                         SULLIVAN & NUTTALL, P.C.

                                         /s/ Thomas J. Nuttall
                                         _____
                                         Thomas J. Nuttall
                                         BBO No.: 546940
                                         1020 Plain Street, Suite 270
                                         Marshfield, MA  02050
                                         (781) 837-7428

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.

Date: April 8, 2006                      /s/Thomas J. Nuttall
                                         _____
                                         Thomas J. Nuttall

22