UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

NORTH READING SCHOOL COMMITTEE,
Plaintiff,

v.                                                                   Civ. No. 05-11162 RCL

BUREAU OF SPECIAL EDUCATION APPEALS
et al
Defendants.
_____

**PARENTS' CONCISE STATEMENT OF FACTS IN OPPOSITION TO NORTH READING SCHOOL COMMITTEE'S MOTION FOR SUMMARY JUDGMENT**

Parents, pursuant to Local Rule 56.1 reply to the Plaintiff's Concise Statement of Material Facts submitted in support of its Motion for Summary Judgment and submit additional material facts as follows:

1. Parents agree with and adopt the facts set forth in paragraphs 1,2, 3 of the Plaintiff's Statement.

2. Paragraph 4 of the Plaintiff's Statement contains assertions of law that the Parents disagree with and dispute.

3. Parents agree that the Student is a resident of North Reading Massachusetts as stated in paragraph 5 of the Plaintiff's Statement.

4. Parents would further state that the Student is a ten-year-old child with at least high average intellectual ability, and is creative and inquisitive.  Student can be self-critical and is sensitive about how his academic performance compares with that of his peers. AR 133-45, 162, 233.

5.  Parents agree with most of the factual assertions in paragraph 6 of the Plaintiff's Statement but would add that the Student has a long-standing, well documented history of significant language-based learning disabilities, deficits in memory and executive functioning, and marked distractibility.  AR 162.   While Student is generally emotionally healthy, his self-esteem is very tied to his perception of his academic performance. AR 162  He can become more easily discouraged than other children his age, even those with language issues, if he is having difficulties with a language-related or academic task, and he sometimes gives up easily.   AR 133-157.

6.  Parents agree with the factual assertions in paragraph 7 of the Plaintiff's Statement but would add that the Student is very aware that his non-disabled peers do not struggle as much as he does academically, is particularly vulnerable to feeling less competent or intelligent than others, and does not want to feel or appear singled out as such. AR 133-57.

7.  Parents agree with the factual assertions in paragraphs 8, 9, 10 and 11 of the Plaintiff's Statement but would add beginning in September 1998 and for the next three academic years (1998-99, 1999-00, 2000-01) Student attended North Reading's integrated pre-kindergarten program under IEPs.  AR 263-79; RT, Vol. 2, 129, 131. At some point during Student's time in preschool, Parents began supplementing his program with private 1:1 speech/language therapy outside of school.  RT, Vol. 2, 131-32.  The IEP developed in June 2001notes Student's relative weakness in short term auditory and sequential memory. The "Parent and/or Student Concerns" section of the IEP notes Parents' concerns about the class size of a regular kindergarten being overwhelming for Student.  AR 255.

8.  Parents accept the factual assertions in paragraphs 12, 13, 14, 15 and 16 of the
    Plaintiff's Statement but would add that Parents did not respond to the 2001-2002 IEP
    because they previously had decided to place Student at Meritor Academy (Meritor).
    RT, Vol. 2, 134.  Parents made this decision because they felt that Student needed a
    full day program.  In approximately late August 2001, Parents informed North
    Reading that they would be sending Student to Meritor and utilizing private speech
    therapy services.  AR 253-62.   Student attended Meritor during the 2001-02 school
    year (kindergarten) where he was in a class of 15 students. RT, Vol. 2, 134-38.
    Student received private speech therapy services after school.  At the end of the
    kindergarten year, at the recommendation of the speech therapist, Parents hired
    Student's kindergarten teacher to provide private tutoring in reading, in lieu of speech
    therapy, for the remainder of the school year as well as the summer of 2002.  *Id.* at
    137-38.   The reading tutor used elements of the Reading Recovery program as well
    as other unspecified methods.  *Id.* at 138.  Both the speech therapist and tutor
    consulted with Mother, who then passed their recommendations to Students teachers.
    *Id.* at 139.

9.  Parents accept the factual assertion in paragraphs 17 and 18 of the Plaintiff's
    Statement but would add that the first grade at Meritor was a class with fewer than 15
    children.  *Id.* at 134-38.  Parent would add that the School District made no offer of
    service to the family during the time that the Student was enrolled at Meritor. *Id* at
    135.

10. Parents accept the factual assertions of paragraph 19and 20 of Plaintiff's Statement
    but would add that the Parent had been in contact with Landmark due to a family

history with that program. RT, Vol. II, 141-142.   At the time of the testing by Dr. Lappen, Parents were concerned that Student was continuing to have speech/language problems, was struggling in school, and was beginning to lose his enthusiasm for school.  AR 158-68; 496-506; RT, Vol. 2, 145.  Dr. Lappen's testing revealed that Student had average to above average cognitive ability with stronger visual-spatial than language skills and a statistically significant difference between the two domains.  AR 158-68.  Test results indicated that Student had deficits in language functioning and processing, including difficulty with word retrieval, and with labeling of his ideas.  AR 158-68.   Student's executive functioning was variable and somewhat inconsistent.  He had some problems with sustained attention and concentration.  AR 162.   Student's academic skills in reading, written language and math were below what would be expected for a child of his age and cognitive ability. AR 158-68; 496-506. Dr. Lappen's assessment of Student's social emotional status was that while his self-esteem was generally intact, Student identified with the "funny kids" and not the "smart kids," was feeling less positive about school than he had in the past, was increasingly aware of how his performance stacked up against that of his peers, and was feeling less competent than his peers.  AR 161-62. Dr. Lappen concluded that Student's overall performance was consistent with ADHD (inattentive type) and a developmental reading disorder.  He made several recommendations including

- At least four sessions per week of individualized support in reading and written language with a learning disabilities specialist that includes work on phonological analysis with a program such as Lindamood-Bell, a

linguistically based approach to reading and written language like Orton-Gillingham or Wilson, and work on sight words, and practice reading aloud to enhance fluency;

- Monitoring of Student's attention and self regulation, and providing numerous accommodations including alternating desk top and high interest tasks, preferential seating, extra response time and time to do assignments; breaking down and reviewing tasks, use of checklists, limiting copying requirements, providing opportunities to practice oral language, providing for home-school communication.  AR 162.

11.  Parents accept the factual assertions in paragraphs 21 and 22 of the Plaintiff's Statement but add:  Parents met with Dr. Lappen shortly after the evaluation to discuss the results, but did not receive a written report until approximately November 2003.  RT, Vol. 2, 145.   Meanwhile, Parents began investigating Landmark School as a possible placement for Student.  RT, Vol. 2, 146-48  Parents were interested in Landmark because another parent told Parents that Landmark served students with language and reading disabilities and because one of Mother's relatives had attended Landmark some years previously.  RT, Vol. 2, 141-45.

12. Parents would add as fact to be considered that: shortly after the Lappen evaluation was completed, still in September 2003, Mother contacted Mr. Jim Canino, Assistant Director of Pupil Personnel Services for North Reading, discussed the Lappen evaluation, and also mentioned Landmark School as a possible placement for Student. R.T. Vol. 2, 143-44.   Mr. Canino told Mother about North Reading's language based elementary classroom.  Mother asked to observe the classroom, and Mr. Canino

informed her that she could do so after North Reading had received Dr. Lappens'

report. RT, Vol. 2, 143-44. Parents received Dr. Lappen's report in November 2003

and sent it to North Reading about a month later, along with a letter requesting a

TEAM meeting as follows:

> …I am concerned about [Student] and his current [Meritor] placement. It
> seems even with the small structured class he is having difficulty
> progressing in accordance with his cognitive abilities due to his disability.
> Please contact me as soon as possible to set up a team meeting to create an
> IEP for him.

AR 495. North Reading received the letter and report on December 17, 2003.

AR 495-506

13.   Parents accept the factual allegations in paragraphs 23, 24, 25, 26, 27 and 28 of the

Plaintiff's Statement but would add: on December 11, 2003, Landmark screened

Student for possible admission. AR 225-28  Formal assessments were consistent with

prior testing, indicating that Student's strengths lie in visual tasks, using verbal

mediation to aid memory, self-correction and oral vocabulary and weaknesses in

phonological memory and processing and coding/decoding skills. *Id.* An interviewer

concluded that Student was appropriate for Landmark. AR 228.

14. Parents accept the factual assertions in paragraph 29 of the Plaintiff's Statement but

would add that: Dr. Mary Lou Dysart conducted the psychological evaluation, which

consisted of a review of Dr. Lappen's report and other records as well as the

Woodcock-Johnson Test of Cognitive Ability-III. AR 169-75.  The standardized

testing revealed strengths in many areas, including verbal comprehension, visual-

auditory learning, spatial relations, and concept formation. AR 171-73.  In these

areas, his percentile ranking for age ranged from the 31st to the 75th percentile. *Id.*

Student had more difficulty with sound blending, short-term auditory memory, and

auditory closure (identifying a completed word after hearing the word pronounced with phonemes).  AR 171-74.   Dr. Dysart observed that Student was "alert to all potential environmental distracters, both auditory and visual," and often needed external redirection to focus and understood directions but had trouble holding them in memory.  AR 169-70.  In sum, Dr. Dysart found her results to be consistent with those of Dr. Lappen.  She also agreed with Dr. Lappen's recommendations, stating that they all could be provided within the public school setting, and noting that Student is "a bright boy" who would benefit from exposure to much of the general curriculum.  AR 175.

15. Pearl Feeney-Grater performed the speech-language assessment, which consisted of standardized testing, review of all records, and observation at Landmark.  AR 182-89; 485-94.   She found Student to have average to above-average cognitive ability and many strengths. AR 187   She also concluded that Student has a specific learning disability affecting executive functioning, self-regulation, short and long term memory and both oral and written expressive language.  AR 182-89.  The Student generally performed in the average range on standardized tests measuring vocabulary, automaticity of word retrieval, ability to attach meaning to words, and the ability to understand and use language in the areas of meaning, structure, and recall.  However, there was scatter among subtests.  *Id*.  The Student did better on tasks accompanied by pictures or where questions could be repeated.  *Id*. at 186.   He also had difficulty with auditory working memory, which slowed his responses to questions.  *Id*.  He was able to express himself orally but showed evidence of retrieval difficulties as well as difficulty with retrieving and formulating responses.  *Id.*  Ms. Feeney-Grater found

that in the classroom, the Student would likely have problems responding quickly to lengthy or complex verbal information, and would benefit from repetition, cuing, and extra time to respond. *Id*. at187   Ms. Feeney-Grater recommended placement in a small, language-based classroom, with speech-language therapy as well as numerous accommodations to help Student with remembering, formulating, and retrieving information, comprehension, and higher order thinking. *Id*. at 189

**16.** A Learning Disabilities (LD) assessment was conducted by Carrie Fiore, who teaches the elementary language-based classroom at the E.E. Little School. AR 176-81; 472-77.  Ms. Fiore administered some of the subtests from the Detroit Tests of Learning Aptitude-4 (DTLA-4). *Id.*  This testing showed average non-verbal skills and "poor" verbal skills [1] with a significant difference between the two domains. *Id.*  The Student had the most difficulty with tests of auditory memory and learning, as well as retrieving information from long-term memory.  Expressively, the Student was more successful with writing answers to questions than responding orally. *Id.*  Like the other evaluators, Ms. Fiore concluded that the Student is an engaging and friendly child with generally average ability to process information and respond to classroom demands, but with difficulties in word retrieval, formulation, receptive skills and working memory that impact reading, writing, and language processing. *Id.* at 179-80.  Ms. Fiore also noted that the Student seemed distractible but was easily refocused with teacher prompts. *Id.* She also recommended a small, structured multi-sensory classroom with support services, such as speech and language, and agreed with Ms. Feeney-Grater on accommodations and reading methodologies. *Id.*

---

[1] Ms. Fiore's report notes that the Student's performance on these tests was worse than on similar tests given by Dr. Lappen, where he had scored in the solidly average range in both domains. *Id.*

17. On February 26, 2004, Ms. Feeney-Grater and Ms. Fiore observed Student for one class period in his Auditory/Oral Expression class at the Landmark School. *Id.* at 178-79. Ms. Fiore observed that Student was quiet but participated appropriately in the class, responded well to the teacher's positive reinforcement and encouragement, and frequently needed teacher prompts or repeated directions because he was distracted by a drawing he was doing during dictation, by his pencil, a previous drawing he had done, the envelope he had drawn on "and his own thoughts;" however, he easily got back on track with teacher prompts. *Id*.

18. Parents accept the factual assertions in paragraph 30 of the Plaintiff's Statement except that Parents would also accept the Hearing Officer's characterization of this program as being "substantially separate". AR 115.

19. Parents accept the factual assertions in paragraph 31 of the Plaintiff's Statement except that Parents would add that as of the hearing date, four students were diagnosed with a specific learning disability, four with a communication disorder, and one with a neurological disability. AR 378.

20. Parents accept the factual assertions contained in paragraph 32 of the Plaintiff's Statement but would add that free-standing whiteboards and bookcases are used to divide the room, and tennis balls are placed on chair legs to reduce noise. AR 121. Parents further state that the testimony of the teacher as to the effectiveness of the division of the classroom was contradicted by Dr. Susan Brefach in her testimony at: RT Vol.1, 71-75.

**21.** Parents accept the factual assertions contained in paragraph 33 of the Plaintiff's Statement but would add that Ms. Fiore created the primary language-based class at the E.E. Little School, and functions as the lead teacher.

**22.** Parents accept the factual assertions contained in paragraph 34, 35 and 36 but would add that the IEP proposes that the Student could access the school psychologist if needed for support. Specific services offered included reading instruction 5x50 minutes per week, small group special education instruction, speech and language services 3x30 minutes per week, 1x15 minutes per week of speech/language consultation, and an approximately 5-week long summer program consisting of "summer support" 3hours/day, 3 days/week and speech/language 1 hour/week. AR116.

**23.** Parents accept the factual assertions contained in paragraph 37 but would add that the rejection of the IEP noted that the rejection "pending observation of the N. Reading Language Based Class Placement." AR 116. Mother stated that she was concerned that the proposed placement would not meet Student's needs because of the varied ages, grades, and skill levels that would be taught within a single classroom. *Id.*

**24.** Parents accept the factual assertions contained in paragraphs 38, 39 and 40 but add that Parents sought additional evaluations because they were unsure of Dr. Lappen's tentative diagnosis of ADHD, and wanted a second opinion. RT, Vol. 2, 152-53.

**25.** Parents would add that: Dr. Brefach administered standardized tests of cognitive, academic, and emotional functioning. AR 133-45; 440-53 She had observed Student at the Landmark School in February and in addition, observed North Reading's proposed program. RT, Vol. 1, 60-183.

26. The results of Dr. Brefach's testing and observations were consistent with the

evaluations of Drs. Lappen and Dysart.  AR 133-45.   Like these prior evaluators, Dr.

Brefach found that Student has high average overall cognitive ability with language

skills consistently weaker than non-verbal skills.  *Id.* at 141-143.  She found that

Student "has difficulty with the entire spectrum of language functioning," including

processing auditory information, discriminating sounds and words, storing

information in short term memory, transferring it to longer term memory, retrieving

information, and organizing expressive language.  *Id.* at 141 In general, Dr. Brefach

found that Student's academic functioning has been compromised by a combination

of language weaknesses, reduced attention, and developmental dyslexia, and that his

academic performance across a variety of tasks is highly uneven.  *Id.* at 141-43  She

concluded that he has a neurologically based learning disability affecting all areas of

functioning, developmental dyslexia, and moderate to significant language learning

problems.  *Id.*

27. Further, Dr. Brefach concluded that Student has significant problems with auditory

processing, such that auditory distractions would interfere with his learning. *Id.*

28. Dr. Brefach noted that emotionally, Student is bright and creative, somewhat

impulsive and disinhibited.  He is very motivated to succeed but gives up easily.  Dr.

Brefach found Student's self-esteem to be "strongly dependent on performance

issues," such that he is "at risk for further deterioration in functioning if he continues

to encounter significant frustration in school."   *Id.*  According to Dr. Brefach, when

Student struggled with schoolwork, he "was very likely to be self-critical, to be more

discouraged than many youngsters his age, and to give up very easily.  So he was

more sensitive and more reactive than many children, even those…who have learning difficulty, and his psychological makeup further impacted his ability to persist and to tolerate frustration and failure." *Id.*

29. Dr. Brefach concluded that Student has three areas of difficulty that interact and complicate programming for him: pervasive receptive and expressive language difficulties; developmental dyslexia; and "a particularly sensitive and reactive emotional profile" that makes him more easily discouraged than other children. *Id.* Because of his combination of difficulties, Dr. Brefach believes Student required all instruction in a small, very homogeneous language based class of eight or fewer students, with reduced auditory distractions. *Id.* Dr. Brefach believes that a public school setting would not likely provide such an environment for Student, but that the Landmark School does provide an appropriate setting. *Id.*

30. Ruth Margulies made findings, in general, that were comparable with those of prior evaluators, including the February evaluation by Pearl Feeney-Grater. AR 146-57. Like prior evaluators, Ms. Margulies concluded that Student' communication and academic performance are compromised by a combination of difficulty with language acquisition and phonological processing, weaknesses in executive functioning and self-regulation, and working memory deficits, as well as a developmental reading disorder, high levels of frustration, attentional problems, and limited endurance. *Id.* at 154. Ms. Margulies identified Student's most pressing needs as "implementation of a systematic, explicit and intensive program …[for acquiring]..more functional decoding skills" while also addressing phonological weaknesses, as Student did not yet have a solid foundation at the phonological level to map speech onto print. *Id.* at

155.   Ms. Margulies suggested a program such as the Lindamood Reading Program for this purpose. *Id*. Ms. Margulies also recommended giving Student strategies to organize and improve his oral expression. *Id.*

**31.** Ruth Margulies did not observe either Student's Landmark School program or the North Reading Elementary language based classroom. RT, Vol. 1, 214-15.

**32.** In June 2004, at Parents' request, Dr. Brefach observed Student in his Landmark placement, and, the next day, observed North Reading's proposed program. RT, Vol. 1, 76-92. Dr. Brefach concluded that the North Reading program was inappropriate for Student, and that Student was appropriately placed at Landmark. *Id.*

**33.** Parents accept the factual assertions in paragraphs 41, 42 and 43 of the Plaintiff's Statement but notes that the references to the record appear incorrect and further state that at least some of the delay in scheduling the meeting in the fall of 2004 can be attributed to the District's limited dates. RT, Vol. III, 47. Parents further state that the substitute IEP from this meeting, covering March 2004-2005 essentially duplicates the IEP issued in March 2004, but adds 30 minutes per week of small group speech/language therapy. The regular education science teacher, Ms. Myette, did not attend this meeting. No goals were developed for the inclusion science class. AR 118, 373-94.

**34.** The Parents reject the characterization of the facts as contained in paragraph 44 of the Plaintiff's Statement and state that the findings of the Hearing Officer as to the Landmark program, AR 87-90, are supported by the records and should be accepted as the facts in this matter. Most of Student's teachers are certified special education teachers, although they may be certified for a different age group than Student's.

Other teachers have certifications pending with the Massachusetts Department of Education.   All teachers and the tutor are supervised by a certified teacher.  AR119. Additionally, all new teachers receive a one-week training session during the summer prior to starting employment at Landmark, where they study the methodologies used at Landmark.  All of Student's teachers, as well as his tutor, have completed training in the LiPS program.  AR 119.

35.  The Landmark School (Landmark) is a private Chapter 766-approved school that specializes in serving students with at least average cognitive ability who have language based learning disabilities, including developmental dyslexia.  RT, Vol. 3, 7.   Landmark provides an intensive program consisting of one-to-one tutorials and small group class instruction across all curriculum areas to address specific language issues.  Id. The elementary program, in which Student is enrolled, serves 44 students, twelve of whom are third graders.  *Id*. at 8

36.  During the spring of 2003-04 and fall of 2004-05, like the other Landmark elementary students, Student received small group instruction in language arts (including written expression), math, auditory/oral expression, literature, combined social studies and science, an elective (which for Student is small engine repair, although  art and woodworking are also offered), and physical education.  *Id*. at 10-12.  Student also has a daily, 1:1 language arts tutorial.  Library and music classes are provided on a biweekly basis.  Student did not receive individual speech/language therapy.  Rather, a speech/language therapist co-teaches his auditory/oral expression class every other week.  Student-teacher ratios for academic classes were 1:5 or 1:6 during 2003-2004 and 1:6 or 1:7 during 2004-05.  *Id*. at 21   Students are grouped by skill level, and

groupings may cut across grade and age lines.  Student is in one group for math, where his skills are stronger, and another for all other subjects.  Both groups comprise third, fourth and fifth graders.

**37.** The reading tutorial is a central focus of Student's program.  The tutor works with Student on the LiPS program for the majority of the time, but also works on other skills such as sequencing days of the week and months of the year, spelling rules, following oral and written directions, and applying the LiPS strategies to contextual reading.  Student's tutor and all of his teachers are trained in the LiPS program, and cue Student to use LiPS strategies throughout the school day.  AR 119.

**38.** Like each Landmark student, Student has a case manager, Ms. Starry Cook, who oversees implementation of his program at Landmark.  Ms. Cook is responsible for reviewing Student's file, designing his language arts tutorial program, supervising his reading tutor by observing the tutorial regularly and giving feedback to the teacher as well as signing off on progress reports for Student's tutorial.  She has observed Student in class on several occasions.  Ms. Cook also attends the various teacher meetings that are held regularly, and is available to Student and his parents to address any concerns.  AR119.

**39.** Student's providers at Landmark and Parents believe that Student has adjusted well to the program, has made friends and is happy there.  AR 119. Parents believe that he has gained confidence, and does homework more willingly and independently.  Landmark's reports reflect that Student is making progress in his classes and in LiPS2 On the other hand, Student has continued to have problems with distractibility and attention, can get overwhelmed with too much oral information at once, and needs

much repetition, simple language, and teacher help with staying focused. AR 119-120.

40. Both North Reading's representatives (Ms. Fiore and Ms. Feeney-Grater) and Parents' expert (Dr. Brefach) observed Student at Landmark in February 2004, shortly after he started there. (Fiore, Feeney-Grater, Brefach) AR 120.

41. Dr. Brefach found the program as a whole to be appropriate for Student because it provides, as she recommends, small classes with peers who appear to be at Student's skill level (based on observation as she has not reviewed those students' records), as well as teachers who consistently and appropriately adapt language in all settings. Dr. Brefach also found the tutorial to be appropriate for addressing Student's various auditory training and reading issues. Finally, Dr. Brefach believed that Student does not require speech-language therapy in addition to his daily program at Landmark because his entire day is linguistically adapted and because he receives a speech therapist's input in his co-taught auditory/oral expression class. AR120.

42. Parents disagree with the characterization of Karl Pulkkinen's testimony as found in paragraph 45. Parents state that Mr. Pulkkinen did acknowledge that teacher certification is important but he did not state that all of the teaching staff for the Student are not certified or are not certified in appropriate areas. Mr. Pulkkinen testified that certain teachers may not have certifications but that some had completed course work and are awaiting receipt of actual documents form the Department of Education. RT, Vol. 2, 35. Mr. Pulkkinen testified that Jay Flannery, the Student's reading tutor had completed a forty-hour training program in the LiPS methodology.

Id at 39.  At least two of the Student's teachers have Masters in special education and three others have a masters degree in education. Id. 55-57.

43.  The Parents accept the factual assertions in paragraph 46 of the Plaintiff's Statement but would add that this recount is both incomplete and was contradicted by the testimony of other witnesses. Ms. Feeney-Grater observed Student in his language arts, math, woodworking, and literature classes, as well as in his reading tutorial.  She found generally that the Landmark program has appropriate instructional techniques, in that it provides teacher-directed classes, structure, organization, and consistency of approach across classes that is important for children with language learning disabilities. She was impressed with the math class and with the tutorial, and particularly with Student's ability to read difficult words.   She was concerned, however, about what she perceived as the absence of social interaction among students and between students and teachers, apparent flatness of Student's affect, absence of verbal transitions, absence of spiraling back and previewing at the beginning of literature class, and the practice of having children draw as they are read to.  In general, Ms. Feeney Grater observed the teachers moving children from one activity to the next without a lot of transitional conversation, as well as numerous lost learning opportunities.  AR 120.

44.  Parents accept the factual assertions contained in paragraph 47 of the Plaintiff's Statement but would add that Ms. Cook does not attend all of these meetings, RT Vol. 2,106, and that she has discussed the Student with his teachers and the heads of the department at Landmark. Id at 118.

**45.** Parents accept the factual assertion contained in paragraph 48 of the Plaintiff's Statement.

**46.** Parents accept the factual assertions contained in paragraphs 49, 50 and 51 of the Plaintiff's Statement but assert that the quotations contained therein must be read in the context of the Hearing Officer's detailed analysis as contained in her twenty page decision.

**47.** Paragraph 52 of the Plaintiff's Statement is a legal assertion, not a true fact. Parents state that the Hearing Officer made extensive findings regarding the licensure and certification of the teachers at Landmark. AR 119.

**48.** Paragraph 53 of the Plaintiff's Statement is not an assertion of fact. Parents deny the assertions contained in paragraph 53.

**49.** Parents accept the factual assertions contained in paragraph 54 of the Plaintiff's Statement.

**50.** Parents accept the quotation from Ms. Fiore's testimony as in paragraph 55 of the Plaintiff's Statement as being her testimony but deny that her conclusions are factual or valid.

**51.** Parents acknowledge that Ms. Pearl-Feeney testified at indicated in paragraph 56 of the Plaintiff's Statement but deny that her conclusions are factual or valid.

**52.** Parents maintain that the following findings of the Hearing Officer, which were omitted from the Plaintiff's Statement, are material facts that should be considered in connection with the Plaintiff's Motion for Summary Judgment:

53.  In the program proposed by the District for the Student, third grade students in the

primary language-based class attend science in the regular third grade classroom with

approximately 23 students.  AR 121-122.

54.  At Parents' request Dr. Brefach observed the language-based class and the science

class proposed by the District in June 2004 and again in February 2005.  In the first

visit, Dr. Brefach concluded that the science class was well-controlled but too

auditorily distracting (because of the class size and multiple learning groups) for

Student.  Additionally, she felt that the language used was not adequately adapted for

Student.  For these reasons, Student would find the science class frustrating and

would not be able to access the curriculum.  In language-based classroom, Dr.

Brefach felt, generally, that the instructional language was not consistently adapted

for Student's needs, that the peer group was too diverse in its skill and grade levels,

and that the number of second graders (3) was too small to form an adequate peer

group for Student. AR 122. She observed the language based class again in February

2005.  AR 122; Record Transcript. Vol. 1, 70-86.  Dr. Brefach recommended that

Parents re-enroll Student at Landmark for 2004-05, and Parents did so.

55. Dr. Brefach's conclusions after her February 2005 observation were similar.  She

found that the structure of the language-based class, where several activities were

going on at the same time in the same room, was auditorily distracting.  She also was

concerned about the peer group, observing that the other third graders did not appear

to have auditory processing problems, and that one student had significant problems

with expressive language and social interaction.  For these reasons, Dr. Brefach

concluded that the North Reading program was still inappropriate for Student, as it

still did not provide the degree of consistency in use of language and reduced auditory

distraction to enable Student to succeed, in light of his unique combination of

dyslexia, auditory processing and memory deficits, and emotional reactivity to

academic difficulties.  Record Transcript, Vol. 1, 70-86. AR 122.

56.  Parents would also add the following statements of fact: The issue of adequate notice

was raised early in these proceedings and was discussed at a prehearing conference

with the BSEA Hearing Officer on December 9, 2004.  The parties agreed to resolve

the issue prior to any hearing and to address the issue by a motion for partial

summary judgment.  This agreement was memorialized in an Order of the Hearing

Officer on December 9, 2004 requiring the parties to produce a joint stipulation of

facts by December 24, 2004 and supporting memoranda no later than December 31,

2004.  AR 32.

57.  The parents then elected not to pursue a claim for reimbursement for the 2003-2004

school year, with the understanding that the School District had no objections to the

notice given for the 2004-2005 school year.  A letter to the Hearing Officer dated

December 22, 2004 set forth that decision. AR 35.  This matter was then discussed in

a Conference Call with the Hearing Officer on December 23, 2004.  That same day,

the Hearing Officer entered an Order indicating that as a result of the parents'

decision not to seek reimbursement for the 2003-2004 school year, "the parties will

not be seeking partial summary judgment on notice issues concerning

reimbursement." AR 36.

58. On the first day of the hearing, a discussion took place as to the effect of the decision

to waive reimbursement for the 2003-2004 school year with regard to the

admissibility of evidence concerning the actions (or inactions) of the School District during the 2003-2004 school year.   The parties and the hearing officer discussed and resolved the issue of notice before the hearing as indicated in the following exchange between counsel for the North Reading Public Schools and the Hearing Officer:

> OFCR. BERMAN: . . . And then, what I would ask the district is whether the district – how can I put this? If the parents – if I tell the parents that they can't present any evidence on anything pertaining to that, those last few months of the 2003/2004 school year, have they also effectively waived any right to present evidence that the current – as to notice and everything else – as far as informing the school district that they're going to continue this unilateral placement, such that they can't make any claims for the 2004/2005 school year?

> MR. NUTTALL:  No.  And I think that that is directly on point on this, as well, because Mr. Sindelar did in fact give us written notice, in the summer of 2004, prior to the 2004/2005 school year.  There had been no notice prior to that point in time.  And that was initially what we were going to address in the summary judgment motion.   . . .

> MR. NUTTALL:  So we had initially addressed the – or were going to address the issue of notice, by way of a summary judgment motion.  And that was what was – Mr. Sindelar and I had a discussion relative to this, and that is where we entered into the understanding that there would be no argument relative to 2003/2004, except as it pertains to child find.

> OFCR. BERMAN:  Right.

> MR. NUTTALL:  So the notice, to the extent that it was required in this case, the district will say was complied with as of the summer of 2004, prior to the start of the 2004/2005 school year, but not prior to that point in time.

> OFCR BERMAN:  Okay.  So that, in other words, there is going to be no issue that the parents didn't give proper notice for 2004/2005.

> MR. NUTTALL:  No.  They did give notice for 2004/2005.

Record Transcript ("RT"), Vol. 1, 40-43.

Respectfully submitted,

Courtney and Timothy Grafton
By their attorneys,
/s/ *Tim Sindelar*
Tim Sindelar, BBO #557273
*/s/ David Mollow*
David Mollow BBO#653597
Ames, Hilton, Martin & Sindelar
22 Putnam Avenue

Date:

Cambridge, MA 02139
(617) 871-2140
 Fax: (617) 871-2141
sindelar@ahmslegal.com

**CERTIFICATE OF SERVICE**

I certify that this document filed through the ECF system will be sent electronically to
registered participants as identified on the Notice of Electronic Filing (NEF) and paper
copies will be sent to those indicated as non-registered participants on April 21, 2006

Date:                                    /s/ *Tim Sindelar*
                                         Tim Sindelar