UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                              )
NORTH READING SCHOOL          )
COMMITTEE,                    )
            Plaintiff,        )
                              )
        v.                    )   CIVIL ACTION NO.
                              )   05-11162-RCL
BUREAU OF SPECIAL EDUCATION   )
APPEALS OF THE MASSACHUSETTS  )
DEPARTMENT OF EDUCATION,      )
MASSACHUSETTS DEPARTMENT OF   )
EDUCATION, AND COURTNEY AND   )
TIMOTHY G., AS PARENTS        )
AND NEXT FRIEND OF M.G.,      )
            Defendants.       )
_____)

# MEMORANDUM AND ORDER ON PLAINTIFF NORTH READING SCHOOL COMMITTEE'S MOTION FOR SUMMARY JUDGMENT

LINDSAY, District Judge.

Before me is a motion for summary judgment of the plaintiff North Reading School Committee ("North Reading"). The motion seeks as relief, pursuant to § 1415(i)(2) of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, my reversal of a final decision of the defendant Bureau of Special Education Appeals of the Massachusetts Department of Education ("BSEA").[1] A BSEA hearing officer concluded, after a hearing, that

---

[1] In a case like this, summary judgment is merely the device for deciding the issue, because "the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995). *Cf. Denmark v. Liberty Life Assur. Co. of Boston*, - - F.3d - -, 2007 WL 914673 at *8 (1st Cir. Mar. 28, 2007) (noting the application of this principle in the context of a court's review of an ERISA claim where "the district court sits more as an appellate tribunal than a trial court" (citation omitted)).

the placement and services offered by North Reading to M.G., a student in the North Reading public schools, during the period from March, 2004 to March, 2005 (the "Student"), were not calculated to provide the Student with a Free Appropriate Publication Education ("FAPE"), and that the Landmark School ("Landmark"), a private, special education school in which the Student's parents, defendants Courtney and Timothy G. (the "Parents"), unilaterally placed the Student, was an appropriate placement. The hearing officer directed North Reading to reimburse the Parents the cost of the Student's placement at Landmark for this period. These decisions of the hearing officer constitute the final decision of the BSEA now on review before me. For the reasons explained herein, I DENY North Reading's motion for summary judgment. Denying North Reading's motion, I affirm the hearing officer's decision.[2]

### 1. Background[3]

The present dispute between the parties concerns whether a special classroom program offered by North Reading was adequate to provide the Student, during the contested period, with the special accommodations that both parties agreed he needed, or whether the Student required placement in a private, special education school. Prior to March 2004, while the disagreement between the parties over this issue was unresolved, the Parents unilaterally enrolled the Student at Landmark. I discuss first the Student's educational history, then turn to his enrollment at Landmark. I next describe the proceedings before, and the decision of, the hearing officer.

---

[2] Also part of this case but not before me at this time are two counterclaims filed by the Parents alleging retaliation for their exercise of their due process rights and claiming attorneys' fees.

[3] Although the parties dispute the correctness of the hearing officer's conclusions and the basis for those conclusions, the facts material to the present motion and review of the hearing officer's decision are undisputed.

a.  The Student's Educational History Pre-Landmark.

The Student, who resides in North Reading, Massachusetts, has a history of a language-based learning disability, deficits in memory and executive function, and marked distractability.  In May, 1998, when the Student was three years old, North Reading began to provide funding for the early intervention services that the Student had been receiving since May, 1997.  Between September, 1998 and June, 2001, the Student attended North Reading's integrated pre-kindergarten program under an Individualized Education Plan ("IEP").[4]  The Parents supplemented this program with private speech/language therapy outside of school, and by June, 2001, the Student had met his IEP goals.  In June, 2001, the Student's IEP TEAM[5] developed an

---

[4] An "individualized education plan" or an "individualized education program," both referred to as an "IEP," is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with [IDEA] and that includes[:] (I) a statement of the child's present levels of academic and functional performance . . . ; (II) a statement of measurable annual goals, including academic and functional goals . . . ; (III) a description of how the child's progress toward meeting the annual goals . . . will be measured and when periodic reports on the progress the child is making . . . will be provided; (IV) a statement of the special education and related services and supplementary aids and services . . . to be provided to the child, or on behalf of the child, and a statement of the program or supports for school personnel that will be provided for the child . . . ; (V) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in . . . activities; (VI) a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child on State and district assessments . . . [or a statement of why the child should take an alternative assessment, if the IEP Team so determines]; (VII) [pertaining to IEPs in effect when the child is 16 and thereafter]." 20 U.S.C. § 1414(d)(1)(A). *See Kathleen H. v. Massachusetts Dep't of Educ.,* 154 F.3d 8, 10 (1st Cir. 1998) (giving a summary description of an IEP and noting that parents dissatisfied with the IEP developed for their child can present a complaint and receive a due process hearing, which, in Massachusetts, is conducted by the BSEA).

[5] The "IEP TEAM" of a child with a disability consists of: "(i) the parents of a child with a disability; (ii) [at least one] regular education teacher of such child (if the child is, or may be, participating in the regular education environment); (iii) [at least one] special education teacher ...; (iv) a representative of the local educational agency ...; (v) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in

IEP for the kindergarten school year, recommending a regular education classroom with a number of classroom accommodations and twice-weekly speech and language therapy.

The Parents did not respond to the IEP for the 2001-2002 school year. In late August, 2001, they notified North Reading that, at their own expense, they would be sending the Student to Meritor Academy ("Meritor"), a private, regular education school, where the Student's mother ("Ms. G.") was a substitute teacher. The Parents placed the Student at Meritor, even though it offered no special education services, because it offered a full-day kindergarten in contrast to the half-day kindergarten available in North Reading. The Student remained at Meritor through the first grade at the Parents' expense. When the Student began at Meritor, the Parents considered whether to use North Reading's speech and language services, but engaged a private speech therapist instead to provide after-school services for him. During the time the Student was enrolled at Meritor, North Reading neither provided, nor offered to provide, any services to the family.

    b. <u>The Student's Enrollment at Landmark</u>.

Concerned that the Student was continuing to have speech and language problems, struggling with his classes, and beginning to lose enthusiasm for school, the Parents, in September, 2003, hired a neuropsychologist, Dr. John Lappen, to evaluate the Student. Though he did not provide a written report until approximately November, 2003, Dr. Lappen met with the Parents shortly after he completed his testing of the Student to discuss the results, including his

---

clauses (ii) through (vi); (vi) ... other individuals who have knowledge or special expertise regarding the child ...; and (vii) whenever appropriate, the child with a disability." 20 U.S.C. § 1414(d)(1)(B); *see Smith v. Fitchburg Pub. Sch.*, 401 F.3d 16, 18 n.2 (1st Cir. 2005).

conclusion that the Student's overall performance was consistent with Attention Deficit Hyperactivity Disorder ("ADHD"), and a developmental reading disorder.[6]  Also in September, 2003, Ms. G. contacted Jim Canino, Assistant Director of Pupil Personnel Services for North Reading.  She discussed the Lappen evaluation and mentioned the Landmark School, which served students with language-based learning disabilities, as a possible placement for the Student.  Mr. Canino told Ms. G. about North Reading's language-based elementary classroom.  She asked to observe the classroom and was told she could do so after North Reading received Dr. Lappen's report.  In October, while the Student was attending second grade at Meritor, Ms. G. submitted an application to Landmark.  Dr. Lappen's report was provided to Landmark on December 11, 2003 and to North Reading on December 17, 2003.  In a letter to North Reading transmitting the report of Dr. Lappen, Ms. G. requested that North Reading review the report and schedule a TEAM meeting to develop an IEP.  North Reading sent the Parents a consent form to enable the district to evaluate the student, which Ms. G. signed on December 24.

Earlier in December,  the Student had received additional testing at Landmark and was accepted for admission there.  Shortly after December 25, 2003, the Parents notified Landmark that they were enrolling the Student, and in January, 2004, the Student began attending Landmark

---

[6] Specifically, according to the hearing officer, Dr. Lappen's "[t]est results indicated that [the] Student had deficits in language functioning and processing . . . [and] [h]e had some problems with sustained attention and concentration. [His] academic skills in reading, written language and math were below what would be expected for a child of his age and cognitive ability." Dr. Lappen made several specific recommendations, including "individualized support in reading and written language with a learning disabilities specialist . . . [and] [m]onitoring of [the] Student's attention and self regulation, and providing numerous accommodations . . . ."

at the Parents' expense.  The Parents did not notify North Reading before they placed the Student at Landmark; they first informed North Reading of this placement in approximately January, 2004.

In February, 2004, North Reading conducted psychological, educational, and speech and language evaluations of the Student and observed him at Landmark.  On March 9, 2004, North Reading held a TEAM meeting and developed an IEP that called for placing the Student at a North Reading elementary school, in a substantially separate Primary Language Based Program ("Program") for all subjects except science, home room, art, music, and physical education.  The nine students in the Program at the time of the hearing ranged in age from the Student's age to approximately two years younger.  Four of them were diagnosed with a specific learning disability, four with a communication disorder, and one with a neurological disability.  The Program was located in a classroom organized into several learning centers where students were divided into small groups to participate in a variety of educational activities, supervised by adult educators and para-professionals.  The learning centers were physically divided by free-standing whiteboards and bookcases, and tennis balls were placed on chair legs to reduce noise.  Ms. G. rejected this IEP on May 10, 2004, "pending observation of the N. Reading Language Based Class Placement."

In the meantime, the Parents had the Student tested by a second neuropsychologist, Dr. Susan Brefach, and a speech and language therapist, Ruth Margulies, in April and May, 2004.  As described by the hearing officer, the "results of Dr. Brefach's testing and observations were consistent with the evaluations" of Dr. Lappen and the expert who had conducted the psychological evaluation for North Reading.  Similarly, "Ms. Margulies' findings, in general, were comparable with those of prior evaluators."  The parents received reports from Dr. Brefach and

6

Ms. Margulies on June 7 and May 26, respectively. Both reports were sent to North Reading on September 16, 2004.

    c. <u>2004-2005 School Year</u>.

On August 20, 2004, an attorney for the Parents advised North Reading by letter that the Parents "intend to enroll [Student] at Landmark for the 2004-2005 school year," that the Parents "will be seeking reimbursement for all costs associated with his placement, including the cost of transportation and evaluations[, and that they would] seek reimbursement for the portion of the 2003-2004 school year in which [Student] attended the Landmark School." The attorney further stated that he intended to request a hearing with the BSEA within two weeks.

The Student began his third grade year at Landmark, and a TEAM meeting was scheduled for September 29, 2004 to review the additional evaluations that had been conducted. After several postponements at the Parents' request, a TEAM meeting was held on December 2, 2004, without the regular education science teacher. The IEP developed at this meeting contained some modifications reflective of the additional evaluations, but it did not include goals for the inclusion science class.

    d. <u>Hearing and Decision</u>.

On October 27, 2005, the Parents filed a hearing request with the BSEA alleging that North Reading had denied the Student FAPE from June, 2003 to March, 2004 by failing to evaluate and offer him an IEP; that North Reading's IEP for the period from March, 2004 to March, 2005 was not designed to provide him with FAPE, and that the Parents' unilateral placement of the Student at Landmark was appropriate. The Parents requested an order directing North Reading to reimburse them for the costs of the unilateral placement from January, 2004

forward, and providing for compensatory services and the cost of litigation, including attorneys' fees.

At a pre-hearing conference, the parties agreed (and memorialized this agreement in an order of the hearing officer) to resolve the issue of adequate notice[7] prior to any hearing and to address, by a motion for partial summary judgment, the question whether notice to North Reading by the Parents was sufficient to require North Reading to reimburse the Parents for the 2003-2004 school year, in the event that the hearing officer found that the Student had been denied FAPE. As set forth in a December, 2004 letter from the Parents' attorney to the hearing officer, that motion became unnecessary, as the Parents elected not to pursue a claim for reimbursement for the 2003-2004 school year, "with the understanding that the School District had no objections to the notice given for the 2004-2005 school year." After a conference call with the parties, the hearing officer issued an order indicating that, as a result of the Parents' decision not to seek reimbursement for the 2003-2004 school year, "the parties will not be seeking partial summary

---

[7] Under certain circumstances, the parents of a child with a disability who previously received special education and related services under the authority of a public agency, may be reimbursed for enrolling the child in school or secondary school without the consent of or referral by the public agency, 20 U.S.C. § 1412(a)(10)(C)(ii), but the cost of reimbursement may be reduced or denied if:

> "(aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP TEAM that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

> "(bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa)." 20 U.S.C. § 1412(a)(10)(C)(iii)(I).

judgment on notice issues concerning reimbursement." On the first day of the hearing a discussion took place as to the effect of the Parents' decision to waive reimbursement for the 2003-2004 school year on the admissibility of evidence concerning North Reading's actions and/or inactions during that school year.[8]

The hearing took place over four days in February and March, 2005, at the BSEA. Experts for both sides testified, including Dr. Brefach, who testified for the Parents. The hearing officer made detailed findings about the relative appropriateness of the two placements for the Student and explicitly credited Dr. Brefach's testimony as to the inappropriateness of the Program proposed by North Reading. The hearing officer also found that Landmark teachers "are certified special education teachers, although they may be certified for a different age group than Student's;" that "[o]ther teachers have certifications pending with the Mass. Department of Education;" that "all teachers and the tutor are supervised by a certified teacher;" and that "[a]ll of Student's teachers, as well as his tutor, have completed training in" a specialized, appropriate reading program. Acknowledging that "[t]his is a very close case," the hearing officer ultimately concluded that, "[w]hen analyzed in light of the student's unique profile, however, the proposed program for 2004-2005 was not appropriate for Student <u>at the time it was offered</u> (March and

---

[8] The exchange between Mr. Nuttall, counsel for the North Reading Public Schools, and Ms. Sara Berman, the hearing officer, included the following:

  Mr. Nuttall: So the notice, to the extent that it was required in this case, the district will say was complied with as of the summer of 2004, prior to the start of the 2004/2005 school year, but not prior to that point in time.

  Officer Berman: Okay. So that, in other words, there is going to be no issue that the parents didn't give proper notice for 2004/2005.

  Mr. Nuttall: No. They did give notice for 2004/2005.

December 2004) because it did not adequately address the Student's well-documented auditory processing and attentional issues" (emphasis in original).[9]

## 2. Discussion.

North Reading asserts that the "hearing officer's decision must be set aside due to significant errors [:] (1) failure to determine whether the Parents were eligible for tuition reimbursement under 20 U.S.C. § 1412(a)(10)(C); (2) failure to apply the correct standard for determining whether North Reading offered the Student a free and appropriate public education and failure to consider federal and state requirements that a Student be educated in the least restrictive environment; and (3) the Hearing Officer's failure to recognize the disputed issue was one of methodology which required a finding in favor of the [School] District." The Parents respond that North Reading "has failed to prove that there is any reason to overturn the findings and conclusion of the state Hearing Officer and her decision that reimbursement for the Student's placement at Landmark was required by a proper application of both IDEA and state special education law."

---

[9] Specifically, the Hearing Officer concluded:

- The placement and services offered by North Reading for period from March 2004 to March 2005 were not calculated to provide student with FAPE;

- Parents' unilateral placement at Landmark was appropriate; however

- Parents are not entitled to reimbursement for the costs of the Landmark placement prior to the start of the 2004-2005 school year.

- The Parents are not entitled to compensatory service for the period from June 2002 through March 2004.

10

a. <u>Jurisdiction and Standard of Review</u>.

This court has jurisdiction pursuant to 20 U.S.C. 1415(i)(2), which instructs the court that it: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. §1415(i)(2)(C). "Judicial review of the decision of the BSEA presents a two-fold inquiry: Whether the state has complied with the procedures of the [IDEA], and whether the IEP developed through those procedures is 'reasonably calculated to enable the child to receive educational benefits.'" *Kathleen H. v. Massachusetts Dep't of Educ.*, 154 F.3d 8, 11 (1st Cir. 1998) (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)). In making this determination, the reviewing court applies an intermediate standard of review. *See Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir. 1993) ("While the IDEA envisions judicial review, the statute 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" (quoting *Rowley*, 458 U.S. at 206)). In a case decided within the last three years, *Lt. T.B. ex. rel. N.B. v. Warwick School Committee*, the First Circuit described the standard of review to be utilized by this court as follows:

> The district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based on the preponderance of the evidence. That independence is tempered by the requirement that the court give due weight to the hearing officer's findings. This intermediate level of review reflects the concern that courts not substitute their own notions of educational policy for that of the state agency, which has greater expertise in the educational arena.

361 F.3d 80, 83-84 (1st Cir. 2004) (citations and internal quotation marks omitted).  What the court must ultimately decide, employing this standard, "is whether a proposed IEP is adequate and appropriate for a particular child at a given point in time." *Town of Burlington v. Dep't of Educ.,* 736 F.2d 773, 788 (1st Cir. 1984), *aff'd* 471 U.S. 359 (1985).  The use of the summary judgement procedure, with its focus on determining whether there are genuine fact issues for trial, *see Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir. 1992), presents a "'puzzling procedural problem' . . . in IDEA cases in light of the requirement that the district court give 'due deference' to the findings and determination of the administrative officer." *Shawsheen Valley Reg'l Vocational Technical Sch Dist. Sch. Comm. v. Massachusetts Bureau of Special Educ. Appeals*, 367 F. Supp. 2d 44, 50 (D. Mass. 2005) (internal citations omitted).  In a case where there are no disputed questions of fact, however, the summary judgment vehicle is appropriate. *Id.*; *cf. Denmark v. Liberty Life Assur. Co. of Boston*, - - F.3d - -, 2007 WL 914673 at *8 (1st Cir. Mar. 28, 2007) (characterizing summary judgment in ERISA context, "where the court's review is usually based only on the administrative record [as] . . . simply a vehicle for deciding the issue" (quoting *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005))).  As neither party has submitted additional evidence for the court's consideration, I decide this case based on the administrative record before me.  *See* 20 U.S.C. 1415(i)(2)(C).

    b. <u>Waiver of Notice</u>.

North Reading argues that the hearing officer committed legal error by neglecting to discuss the notice requirements of 20 U.S.C. § 1412 (a)(10)(C).  North Reading, however, did not raise this argument before the hearing officer, except to the extent that it waived any claim to inadequate notice as to the 2004-2005 school year.  It appears from the administrative record

(and North Reading's counsel acknowledged as much at oral argument on the present motion) that North Reading explicitly considered the issue whether notice was adequate for the 2004-2005 school year and conceded that it was.  By choosing not to argue this issue before the BSEA, North Reading has foregone any right to argue it now.  *See Pepperell Assocs. v. United States Envtl. Prot. Agency*, 246 F.3d 15, 27 (1st Cir. 2001) ("As to [petitioner's] argument that it lacked notice, it was not raised in a timely fashion before the agency, and so is not before us for review"); *Massachusetts Dep't of Public Welfare v. Sec'y of Agric.*, 984 F.2d 514, 523 (1st Cir. 1993) ("we hold that [petitioner], by neglecting to raise this claim before the Board, waived any right to object"); *id*. ("In the usual administrative law case, a court ought not to consider points which were not seasonably raised before the agency").  *See also MacDougall v. Potter*, 431 F. Supp. 2d 124, 129 (D. Mass. 2006) (where defendant offered court no evidence that he raised timeliness issue prior to issuance of Final Agency Decision on sexual harassment claim, and Final Agency Decision "makes no mention of any such argument but rather address the merits of the plaintiff's complaint," court found that defendant had "waived its right to raise the affirmative defense of untimely exhaustion of administrative remedies").  Although "there are exceptional circumstances under which a court might dispense with the raise-or-waive rule in the administrative law context," *Dep't of Public Welfare*, 984 F.2d at 524 (citation omitted), "[a]s a general matter . . . courts will not entertain an issue that the parties failed to raise in the proper administrative venue unless the issue is jurisdictional in nature or some other compelling reason exists."  *Id*.  No compelling reason is offered by North Reading here to justify resurrecting any claim of adequacy of notice.  Having waived the issue before the BSEA, or at the very least,

13

having failed to argue it there, North Reading cannot now argue that the hearing officer "erred in failing to consider [it] as a threshhold matter."

    c. The Hearing Officer's Conclusions.

The hearing officer reached two substantive conclusions now challenged by North Reading: (1) placement and services offered by North Reading for the period from March, 2004 to March, 2005 were not calculated to provide the Student with FAPE; and (2) the Parents' unilateral placement at Landmark was appropriate. North Reading argues that the hearing officer applied an improper standard in analyzing whether North Reading offered FAPE to the Student; that the hearing officer neglected to consider IDEA's requirement that students with disabilities be educated, to the maximum extent possible, with students who do not have disabilities; that the hearing officer failed to defer appropriately to the local school district on what was essentially a question of methodology; and that the Landmark School is inappropriate for the Student. The Parents respond that the hearing officer correctly concluded that IDEA requires that an IEP provide *measurable* benefit to a student; that an inappropriate program is not rendered appropriate by being the least restrictive program; that the hearing officer "provided due deference to the opinions of all witnesses in determining the program offered by the District would not provide" FAPE to the Student; and that the Landmark School "provides a comprehensive and integrated program designed to address the Student's specific individual needs and is an appropriate placement."

As the First Circuit has observed, "[t]he adequacy of an IEP is a mixed question of fact and law." *Warwick Sch. Comm.*, 361 F.3d at 84. "The focus of inquiry under 20 U.S.C. § 1415(e)(i) must recognize the IDEA's modest goal of an appropriate, rather than an ideal,

education.[10]  Ultimately, when the evidence permits two plausible views of the appropriateness of a BSEA decision, the BSEA's choice should not be lightly disturbed." *David T. v. City of Chicopee*, 431 F. Supp. 2d 180, 182 (D. Mass. 2006) (citations and internal quotation marks omitted).  *See Shawsheen Valley*, 367 F. Supp. 2d at 50 ("Where a state administrative decision rules a proposed IEP invalid because it has not met the state's substantive or procedural requirements pertaining to a free appropriate public education . . . a federal court should accord the findings deference [and should be] more circumspect about its intrusion." (quoting *Burlington*, 736 F.2d at 792)).  This is especially true where, as here, the hearing officer recognized that this was a "close case," and applied her expertise to resolve difficult questions. *Cf. Cobble v. Comm'r of the Dep't of Social Servs.*, 430 Mass. 385, 391 (1999) ("an agency's judgment on questions of fact will enjoy the benefit of the doubt in close cases").

The hearing officer performed a two-step inquiry, citing to cases from the Supreme Court, this district and the BSEA itself to support her analytical framework.  She wrote:

> The first issue here is whether the program and services that North Reading offered to Student in the IEPs proposed in March and December 2004 were reasonably calculated to provide FAPE.  If so, the inquiry stops.  If not, the issue is whether the Parents' unilateral educational placement at the Landmark School was 'appropriate,' i.e. whether it was reasonably tailored to meet Student's special educational needs.

The hearing officer's findings as to whether North Reading's IEP would have provided the

---

[10] Individual States are permitted to establish standards higher than IDEA's floor, and Massachusetts previously required the Department of Education to "administer programs that 'assure the maximum possible development' of a child with special needs," *Kathleen H.*, 154 F.3d at 10 (quoting *Stock v. Massachusetts Hosp. Sch.*, 392 Mass. 205, 211 (1984) (quoting Mass. Gen. Laws ch. 71B, § 2, as in effect at the time)).  Now, however, that same section of Massachusetts law requires only that a child be provided with a "free and appropriate education," rather than "the maximum possible development."  St. 2000, c. 159, § 154, effective Jan. 1, 2002.

15

Student with FAPE are detailed and supported by the record; there is thus no reason to disturb them.[11]  *See Rowley,* 458 U.S. at 207; *Warwick Sch. Comm.*, 361 F.3d at 83-84.  North Reading argues that the hearing officer's use of the word "meaningful" in connection with educational benefit indicates that she misunderstood the standard by which she was to evaluate the program offered by North Reading.[12]  As the cases she cited do not use the term "meaningful benefit," so the argument goes, that misunderstanding caused the hearing officer to hold the IEP offered by North Reading to an inappropriately high standard which therefore requires reversal of her decision.  The Parents respond that the hearing officer was correct in stating that IDEA requires that an IEP provide measurable benefit.

---

[11] North Reading also challenged, both in its written submission to this court and at oral argument, the hearing officer's comment that "while it may very well be possible to modify the environment of the North Reading program to be more suitable for Student, North Reading has presented no evidence of whether and how that might be done."  North Reading points out, however, that the IEP suggested modifications to the environment that North Reading could make to assure the provision of FAPE to the Student.  This evidence was considered, and rejected as inadequate, by the hearing officer.

[12] The hearing officer wrote the following, reproduced here with internal citations omitted:

> In general, FAPE encompasses substantive appropriateness, placement in the least restrictive environment (LRE) consistent with providing an appropriate program, and conformity with the IDEA's procedural requirements.  Substantively, federal courts have interpreted FAPE to mean an IEP and services that provide "significant learning" and confer "meaningful benefit" on the student via "personalized instruction with sufficient support services to permit the child to benefit educationally."  The IEP must be tailored to the unique needs of the disabled child, and must be "reasonably calculated to provide effective results and demonstrable improvement in the educational and personal skills identified as special needs"'  Some federal courts have held that "effective results" and "demonstrable improvement" should be measured in light of the student's individual potential.  On the other hand, the IDEA does not require districts to maximize a student's potential, but rather to assure access to a public education and the opportunity for meaningful educational benefit.

Case law does not articulate in easily replicable language a clear standard that a hearing officer or judge is to use to evaluate an IEP, *see Rowley*, 458 U.S. at 188 (statutory definitions in IDEA "tend[] toward the cryptic rather than the comprehensive"), but it is well-established that an IEP must be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade," *id*. at 204, and must provide for "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Id*. at 188-89. The First Circuit has characterized the federal floor, which defines the minimum that must be offered to all handicapped children, as providing a "*meaningful*, beneficial educational opportunity," *Burlington*, 736 F.2d at 789, and that court has stated that a handicapped child's educational program "must be reasonably calculated to provide '*effective results*' and '*demonstrable improvement*' in the various 'educational and personal skills identified as special needs.'" *Lenn*, 998 F.2d at 1090 (quoting *Burlington*, 736 F.2d at 788) (emphasis added).

In this case, the hearing officer clearly acknowledged her understanding that "the IDEA does not require districts to maximize a student's potential." She thus recognized that neither IDEA nor Massachusetts law requires that an IEP assure the maximum possible development of a child with special needs. I cannot say, therefore, that the hearing officer misunderstood the applicable standard or that her analysis constituted legal error. For that reason, and in recognition of the hearing officer's expertise, I decline North Reading's invitation to overturn the hearing officer's careful assessment of the IEP offered by North Reading and her corresponding conclusion that it "was not appropriate for Student . . . because it did not adequately address

17

Student's well-documented auditory processing and attentional issues."[13]  *See Lenn*, 998 F.3d at 1087 ("the judicial function at the trial-court level is 'one of involved oversight,' and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale" (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 989 (1st Cir. 1990))).  *See also Cobble*, 430 Mass. at 391 (appropriate degree of judicial deference to administrative decisions ensures that "agency's judgment on questions of fact will enjoy the benefit of the doubt").

Having found the program offered by North Reading inappropriate for the Student, the hearing officer then turned to the program offered by Landmark.  She concluded that placement at Landmark was appropriate, that Landmark "addresses the Student's language and reading issues in much the same way that North Reading proposes to do, in an environment that does not exacerbate his attentional issues," and that the Student "appears to have made effective progress at Landmark."  North Reading challenges these findings, arguing essentially that Landmark's teachers lack experience and proper certification, and that the hearing officer should have credited North Reading's witnesses rather than the Parents' witnesses as to the effectiveness of the Landmark program.

To justify reimbursement for their unilateral placement of the Student in Landmark, the Parents need not prove that Landmark is perfect; once they have established that the Program and

---

[13] North Reading argues that the hearing officer did not consider the IDEA's requirement that students with disabilities be educated with students who do not have disabilities to the maximum extent possible.  *See* 20 U.S.C. § 1412(a)(5)(A).  North Reading's attack in this regard is off the mark; the hearing officer did indeed discuss this requirement of federal and state law.  That the hearing officer ultimately concluded that the Student's particular educational needs required placement in a more restrictive environment than that offered by North Reading does not mean that she did not consider the IDEA's preference for mainstreaming.

services offered by North Reading were inappropriate, they must demonstrate only that the privately obtained services are appropriate. *See Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 14 (1993) (private parental placements need not meet State educational standards for parents to receive reimbursement); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985) (reimbursement of parents for expenditures on private special education of a child is appropriate if "court ultimately determines that such placement, rather than a proposed IEP, is proper under the [IDEA]"). Given that this is a fact-intensive inquiry that relies on credibility determinations (which the hearing officer, with both expertise and contemporaneous perspective, is in a better position than I to make), there is no reason to disturb the hearing officer's conclusion that Landmark is an appropriate placement.[14] I conclude, therefore, that the Parents are entitled to reimbursement.

### 3. Conclusion.

Plaintiff North Reading's motion for summary judgment is DENIED. The decision of the BSEA is hereby affirmed. Still unresolved are the Parents' counterclaims. I direct the clerk to schedule a status conference at which the parties and I can discuss an appropriate mechanism for the resolution of those matters.

SO ORDERED.

/s/ REGINALD C. LINDSAY

United States District Judge

---

[14] As to North Reading's challenge to the hearing officer's findings with regard to the certifications of the Student's teachers at Landmark, the hearing officer found specifically that "[m]ost of Student's teachers are certified special education teachers, although they may be certified for a different age group than Student's. Other teachers have certification pending with the Mass. Department of Education. All teachers and the tutor are supervised by a certified teacher." She found, further, that all teachers receive a one-week training session, study methodologies practiced at Landmark, and have completed training in a specialized reading program. She ultimately concluded that Landmark was an appropriate placement for the Student. The record contains adequate support for this conclusion.

DATED: March 30, 2007